IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN



 




NO. 3-92-619-CR




GREGORY JOSEPH STANUL, JR.,



 APPELLANT


vs.





THE STATE OF TEXAS,



 APPELLEE


 



FROM THE DISTRICT COURT OF BELL COUNTY, 264TH JUDICIAL DISTRICT



NO. 40,721, HONORABLE JOE CARROLL, JUDGE PRESIDING


 





PER CURIAM

 A jury found appellant guilty of murder and assessed punishment at imprisonment
for seven years. Tex. Penal Code Ann. § 19.02 (West 1989). Appellant challenges the
sufficiency of the evidence, both factually and legally, to support the conviction. He also
complains of the jury finding that a deadly weapon was used in the commission of the offense. 
We will affirm.


1. Sufficiency of evidence

 On June 15, 1991, emergency medical personnel were called to the apartment
occupied by appellant, his wife, Ann Marie Stanul, and their son, eight-month-old Zachariah
Stanul. They found appellant and his wife attempting to revive Zachariah, who was not breathing
and had no heartbeat. Although medical treatment succeeded in restoring the child's heartbeat,
he was unable to breathe without the aid of a respirator. Subsequent tests determined that
Zachariah had no brain function, and he was declared dead on June 17.

 The attending physicians testified that the child died as a result of severe trauma
to the brain. This was confirmed during autopsy, which disclosed massive subscapular and
subdural hemorrhages on both sides of the skull. All of the doctors testified that injuries of this
sort are caused by the head striking a hard, immovable surface with great force. Dr. Dennis
Schellhase, a pediatric critical care physician who treated Zachariah at Scott and White Hospital,
testified that 


[t]he medical literature and my experience would suggest that trauma -- the force
required to generate that trauma, is consistent with motor vehicle accidents, being
thrown from a car, falling from several stories or being battered. And those are
really the three things that we think about when we see those -- that type of injury. 
And it requires more than just falling down. It really requires significant force to
cause such injury.



Schellhase and Dr. Jeffery Barnard, the medical examiner who performed the autopsy, testified
that in the absence of any evidence that a child has been in an accident of the severity described
above, the most likely cause of such an injury is child abuse. In his report, Barnard classified
Zachariah's death as a homicide. Dr. Vincent DiMaio, a forensic pathologist who examined the
medical records and the autopsy report, testified that the child 


died as a result of massive blunt trauma. There's three ways this could occur. 
One, he could have been flung and impacted a hard flat surface. Two, he could
have been swung -- usually by the feet they do it -- into a hard flat surface. And
less likely, the injuries would be due to multiple severe blows to the head, with the
last being the least likely.



The medical witnesses agreed that the fatal injuries could not have been caused by bumping the
child's head against its crib, by playfully shaking the child, or by an adult falling while holding
the child in his arms.

 Other evidence showed that Zachariah had been born while appellant was in Saudi
Arabia serving in Operation Desert Storm, and that appellant had returned to the United States
two months before the incident when the child was approximately six months old. A social
worker testified that Ann Marie told her at the hospital that Zachariah cried around appellant. 
Two military colleagues of appellant testified that in a conversation two days before the child was
injured, appellant told them that Zachariah's crying bothered him and that he had to get out of the
house to keep from hitting the boy. 

 Appellant and his wife testified that the family spent most of the day in question
shopping. After returning home, appellant placed Zachariah in his crib, bumping his head
accidentally. The child began to cry, so appellant picked him up and played with him briefly. 
He then returned the child to his crib and joined his wife. Shortly after this, Ann Marie left to
go to the post office. She returned five or ten minutes later, and laid down on the bed to take a
nap. Before joining her, appellant decided to check on Zachariah. He found the child lying in
the crib with his eyes half-open, not breathing. There was vomit on the sheet. Appellant picked
up the child and called for his wife. As he turned to run from the room, he tripped and fell. He
struck the floor with Zachariah under him. At this point, Ann Marie entered the room and began
to administer CPR while appellant called for help. Both appellant and his wife testified to
appellant's love for Zachariah and denied that the child's crying troubled appellant.

 Also testifying on appellant's behalf were Byrom Donzis, a lecturer in sports
medicine and designer of protective equipment widely used by professional and amateur athletes,
and Steve Ingram, a biomechanical engineer and director of biomechanics at the Texas Sports
Science Institute. Donzis testified that he and Ingram had developed a system for determining the
force required to cause various injuries to the body through computer analysis of videotapes of
such injuries made when they occurred. Donzis further testified that he videotaped appellant in
his apartment as he reenacted his fall with Zachariah. Ingram testified that his analysis of this
videotape indicated that the child's head would have been moving at a velocity of four meters per
second, and would have received a crushing force of between 380 and 530 pounds when he struck
the floor beneath appellant. Donzis testified that, in his opinion, this force was sufficient to cause
the fatal injuries.

 In rebuttal, the State called Dr. David Hardy, another pediatric critical care
physician at Scott and White Hospital. Hardy testified that he had examined the medical records,
the autopsy report, and the videotape made by Donzis, and was of the opinion that Zachariah's
fatal injuries could not have been caused by a fall of the sort described by appellant and depicted
in the videotape.

 There was no dispute that Zachariah sustained severe brain trauma, nor any dispute
that appellant in some way inflicted this injury. The contested issue at trial was the nature of the
circumstances surrounding the injury. Appellant's theory was that Zachariah stopped breathing
for some reason, perhaps sudden infant death syndrome or perhaps by choking on his vomit, and
that the brain trauma was sustained when appellant accidentally fell with the child in his arms. 
The State's theory was summarized in this jury argument:


[T]he crying is driving him nuts. . . . He's crying. He's fussing. It is not an
orderly universe for Greg Stanul any more.


 And then they have a discussion about the bills. And then Ann leaves to
go to the post office. And then I guarantee you, Ladies and Gentlemen, that little
boy who was supposed to be down for his nap, started crying again. And Greg
Stanul goes in there to stop the crying.


 At the moment that he slams Zach on the floor, because I think the evidence
supports that that is what happened, slamming him on the floor by his heels or by
his body in some fashion, to create the arcing rotational deceleration forces that the
doctors testified caused this injury, at the moment that he slammed Zach on the
floor, he intended to shut him up. At that moment he intended it.


 . . . .


The issue for you to decide is, at the moment when Zach's head hit the floor, did
Gregory Stanul mean to hurt him bad. You bet. You bet he did.



 The district court's charge instructed the jury to find appellant guilty of murder if
it found beyond a reasonable doubt that appellant,


intending to cause serious bodily injury to an individual, Zachariah Thomas Stanul,
commit[ted] an act clearly dangerous to human life, to-wit: by then and there
striking the said Zachariah Thomas Stanul's head with his fist, or striking the said
Zachariah Thomas Stanul's head with an object to the Grand Jury unknown, or by
slamming the said Zachariah Thomas Stanul's head against an object to the Grand
Jury unknown, thereby causing the death of the said Zachariah Thomas Stanul.



In determining the legal sufficiency of the evidence to support a criminal conviction, the question
is whether, after viewing all the evidence in the light most favorable to the verdict, any rational
trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307 (1979); Griffin v. State, 614 S.W.2d 155 (Tex. Crim. App.
1981). From the medical testimony in this cause, the jury could rationally find beyond a
reasonable doubt that a blow to an infant's head of the sort alleged in the indictment and set forth
in the application paragraph is an act clearly dangerous to human life, and that Zachariah's death
was caused by such an act. The jury could rationally find from the other evidence that appellant
committed that act. Given the nature of the act, the jury could rationally infer that appellant acted
with the intent to cause serious bodily injury. Point of error five is overruled.

 When conducting a factual-sufficiency review, we do not view the evidence in the
light most favorable to the verdict. Instead, we consider all the evidence equally, including the
testimony of defense witnesses and the existence of alternative hypotheses. Orona v. State, 836
S.W.2d 319 (Tex. App.--Austin 1992, no pet.). We will set aside the verdict only if it is so
contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Stone v.
State, 823 S.W.2d 375, 381 (Tex. App.--Austin 1992, pet. ref'd as untimely filed); Orona, 836
S.W.2d at 321. In this cause, defense witnesses with expertise in biomechanics testified that the
injury to the child's head could have been caused in the manner suggested by appellant. These
witnesses, however, were not physicians and did not claim to have expertise with respect to the
causes of brain trauma in infants. The medical witnesses, who were shown to have such
expertise, unanimously testified that the fatal blow to Zachariah's head could not have been
inflicted by an accidental fall while in appellant's arms. Further, there is no evidence other than
appellant's testimony supporting the hypothesis that Zachariah stopped breathing before the injury
to his head. We conclude that the jury's verdict is not so contrary to the overwhelming weight
of the evidence as to be clearly wrong and unjust. Point of error four is overruled.


2. Deadly weapon 

 In answer to a special issue, the jury found that appellant used a deadly weapon in
the commission of the offense, and this finding was entered in the judgment. Tex. Code Crim. Proc. Ann. art. 42.12, § 3g(a)(2) (West Supp. 1994). (1) Appellant argues in point of error
one that a floor cannot be a deadly weapon within the meaning of Penal Code section 1.07(a)(11). 
Tex. Penal Code Ann. § 1.07(a)(11) (West 1974). (2) In points of error two and three, appellant
further argues that if section 1.07 is interpreted to encompass a floor as a deadly weapon, the
statute is impermissibly vague and denies him due process and due course of law. U.S. Const.
amend. XIV; Tex. Const. art. I, § 19.

 The State responds to these points by urging that the jury did not find that appellant
used the floor as a deadly weapon. In finding appellant guilty, the jury found that appellant struck
Zachariah's head with his fist or with an object unknown, or slammed his head against an object
unknown. The special issue asked the jury if a deadly weapon was used without specifying the
weapon. (3) The State concludes that in the absence of a showing that the jury necessarily found the
floor to be a deadly weapon, appellant's points of error present nothing for review.

 Although the evidence in this cause is ultimately inconclusive with respect to the
precise manner in which appellant inflicted the fatal injury, the evidence strongly suggests that
the injury was sustained when the child's head was struck against the floor. Dr. DiMaio testified
that it was unlikely, albeit possible, that the child's injury was the result of blows to the head with
a fist. Several of the medical witnesses referred to a wall or a floor as the sort of surface capable
of inflicting the observed trauma. The wall in Zachariah's bedroom had no observable marks to
indicate that his head was struck against it, and the State concedes that the child's room had no
other large flat surface except the floor. In her argument to the jury quoted above, one of the
prosecutors expressed her belief that appellant slammed Zachariah's head against the floor. Under
the circumstances, we believe that it is appropriate to address appellant's points of error.

 Since the adoption of the current Penal Code, whether a thing is a deadly weapon
is entirely controlled by statute. Thomas v. State, 821 S.W.2d 616, 619 (Tex. Crim. App. 1991). 
As it applies to the facts of this cause, section 1.07(a)(11) defines "deadly weapon" as anything
that in the manner of its use or intended use is capable of causing death or serious bodily injury. 
Penal Code § 1.07(a)(11)(B). While this definition appears to be open-ended, appellant argues
that both common sense and case law require that a deadly weapon be a "weapon" and an
"instrument." Appellant does not, however, define either of the latter terms. Ultimately, his
argument is nothing more than an assertion that a deadly weapon must be an "instrument," that
a floor is not an "instrument," and therefore a floor cannot be a deadly weapon.

 Appellant cites several opinions in which an alleged deadly weapon was referred
to as a "weapon," "instrument," or "object." Turner v. State, 664 S.W.2d 86, 90 (Tex. Crim.
App. 1983) ("the evidence courts normally look to in determining whether an instrument or object
is a deadly weapon from the manner of its use or intended use is not in the record"); English v.
State, 647 S.W.2d 667, 669 (Tex. Crim. App. 1983) ("we assay the facts of a particular case to
determine whether the manner of the weapon's use and intended use was such as to allow the jury
to infer that the weapon was deadly"); Garza v. State, 695 S.W.2d 726, 728 (Tex. App.--Dallas
1985), aff'd, 725 S.W.2d 256 (Tex. Crim. App. 1987) ("instrument that is not a deadly weapon
per se can qualify as a deadly weapon"). In none of the cases cited, however, is it held that a
thing must be a "weapon" or an "instrument," however defined, in order to be considered a deadly
weapon.

 Appellant also notes that courts often look at the size, shape, or sharpness of a thing
in determining its deadly character. Brown v. State, 716 S.W.2d 939, 946 (Tex. Crim. App.
1986) (knife); Compton v. State, 759 S.W.2d 503 (Tex. App.--Dallas 1988, no pet.) (broken
bottle); Garza, 695 S.W.2d at 728 (belt buckle); Jackson v. State, 668 S.W.2d 723 

(Tex. App.--Houston [14th Dist.] 1983, pet. ref'd) (ax handle). Appellant argues that a floor
cannot be a deadly weapon because its size, shape, and sharpness are irrelevant to its deadliness. 
That size, shape, and sharpness are relevant criteria in determining the deadliness of some things
does not mean, however, that they must be relevant in every case, or that something cannot be
a deadly weapon irrespective of its size, shape, or sharpness. In any event, the floor's size and
shape were relevant to its deadliness in this cause, since the medical testimony was that the child's
head was struck by or against something large and flat. 

 Next, appellant refers us to section 46.01 of the Penal Code, in which various types
of weapons are defined. Tex. Penal Code Ann. § 46.01 (West 1989 & Supp. 1994). Each of
these devices, appellant asserts, is an "instrument." Appellant also cites section 46.11, penalizing
the possession or concealment of a deadly weapon in a penal institution. Tex. Penal Code Ann.
§ 46.11 (West 1989). Appellant asks, "How would the statements `he concealed his floor,' or
`he possessed his floor' make sense?" These statements, of course, do not make sense. But
because some deadly weapons are concealable instruments, it does not follow that every deadly
weapon must be a concealable instrument. 

 Where a statute is clear and unambiguous, the legislature must be understood to
mean what it has expressed, and it is not for the courts to add or subtract from the statute. Boykin
v. State, 818 S.W.2d 782 (Tex. Crim. App. 1991); Ex parte Davis, 412 S.W.2d 46, 52 (Tex.
Crim. App. 1967). It is constitutionally permissible for a court to depart from the plain language
of a statute only if necessary to avoid an absurd result. Boykin, 818 S.W.2d at 785. Section
1.07(a)(11)(B) unambiguously states that anything used to cause death is a deadly weapon. We
believe, contrary to appellant's contention, that it is not absurd to apply the statute as written. 

 The Court of Criminal Appeals has indicated that it does not read the statutory
definition of "deadly weapon" in the narrow manner urged by appellant. In Turner, the court
reaffirmed opinions predating the current penal code holding that hands, fists, and feet can be
deadly weapons if used to cause death. The court rejected the defendant's assertion that only
inanimate things can be deadly weapons under section 1.07(a)(11). 664 S.W.2d at 89-90. In
Mixon v. State, 804 S.W.2d 107 (Tex. Crim. App. 1991), the court adopted the holding of the
court of appeals that an unknown object can be a deadly weapon in the manner of its use. This
holding is inconsistent with the notion that a thing must possess certain inherent characteristics
(for example, be an "instrument") in order to be a deadly weapon. In Thomas, the Court of
Criminal Appeals pointed out that there are two types of "deadly weapons" as that term is defined
by section 1.07(a)(11): those that are deadly by design and those that become deadly by their use. 
821 S.W.2d at 619-20. The court went on to observe,


Whether a particular knife is a deadly weapon by design, a deadly weapon by
usage, or not a deadly weapon at all, therefore, depends upon the evidence.


 The same is, of course, also true of every other object in the world,
including automobiles, telephone cords, bathwater, feather pillows, golf clubs or
shanks.



Id. at 620 (emphasis added). (4) 

 Under section 1.07(a)(11), only a firearm is a deadly weapon as a matter of law. 
Thomas teaches that whether any other thing is a deadly weapon under the statute depends on the
evidence in the particular case in which the question arises. Thus, a thing is a deadly weapon in
a given case if the evidence in that case shows that the thing was manifestly designed, made, or
adapted for the purpose of inflicting death or serious bodily injury, or if the evidence shows that
it was capable of causing death or serious bodily injury in the manner of its use or intended use
in that case. See Holder v. State, 837 S.W.2d 802, 807-09 (Tex. App.--Austin 1992, pet. ref'd)
(unloaded BB pistol used in robbery was not shown to be deadly weapon in manner of its use);
Taylor v. State, 735 S.W.2d 930, 948-49 (Tex. App.--Dallas 1987), aff'd, 786 S.W.2d 295, 322
(Tex. Crim. App. 1990) (where defendant poured gasoline in room occupied by her unconscious
husband and ignited gasoline to enhance fire resulting in his death, fire constituted deadly weapon
in manner of its use). 

 In this cause, the evidence shows that appellant, intending to cause serious bodily
injury, struck the victim's head with or against something large, flat, and hard, probably the floor,
with such force as to cause fatal brain trauma. The jury could rationally find that the floor was
capable of causing death or serious bodily injury in the manner of its use by appellant and,
therefore, was a deadly weapon. Cf. Parris v. State, 757 S.W.2d 842, 847 (Tex. App.--Dallas
1988, pet. ref'd) (sidewalk not deadly weapon absent evidence of purposeful use to inflict injury). 
Point of error one is overruled.

 Points of error two and three are also overruled. When analyzing a statute for
vagueness when no First Amendment rights are involved, we need determine only if the statute
is impermissibly vague as applied to the challenging party's specific conduct. Arnold v. State,
853 S.W.2d 543, 546 (Tex. Crim. App. 1993). Thus, it is incumbent on appellant to show that
in its operation, section 1.07(a)(11)(B) is unconstitutional as applied to him in his situation. 
Bynum v. State, 767 S.W.2d 769, 774 (Tex. Crim. App. 1989). We believe that a person of
ordinary intelligence understands that death or serious bodily injury can result if an infant's head
is slammed against a floor with sufficient force. We therefore conclude that section
1.07(a)(11)(B) gives a person of ordinary intelligence sufficient notice that if a floor is so used,
it is a deadly weapon under the circumstances.

 The judgment of conviction is affirmed.


Before Justices Powers, Jones and Kidd

Affirmed

Filed: February 2, 1994

Publish
1. At the time of appellant's trial, murder was not an offense enumerated in article 42.12,
section 3g(a)(1). Act of May 21, 1985, 69th Leg., R.S., ch. 427, § 1, 1985 Tex. Gen. Laws
1532, 1535 (Tex. Code Crim. Proc. Ann. art. 42.12, § 3g(a)(1), since amended). Effective
September 1, 1993, section 3g(a)(1) was amended to add murder as an enumerated offense. Act
of May 29, 1993, 73rd Leg., R.S., ch. 900, § 4.01, 1993 Tex. Gen. Laws 3716, 3718 (Tex. Code
Crim. Proc. Ann. art. 42.12, § 3g(a)(1) (West Supp. 1994)).
2. The Penal Code definition of "deadly weapon" is expressly adopted by article 42.12, section
3g(a)(2).
3. An affirmative finding that a deadly weapon was used may be made even if the weapon is
not identified. Mixon v. State, 781 S.W.2d 345, 346-47 (Tex. App.--Houston [14th Dist.] 1989),
aff'd, 804 S.W.2d 107 (Tex. Crim. App. 1991). 
4. We find the court's reference to bathwater particularly interesting, since appellant asserts
in his brief that a body of water cannot be a deadly weapon under his reading of the statute.