COURT OF APPEALS
SECOND 
DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-04-160-CR
 
 
MICHAEL 
ALEXANDER GORDON                                             APPELLANT
A/K/A 
MICHAEL A. GORDON
 
V.
 
THE 
STATE OF TEXAS                                                                  STATE
 
 
------------
 
FROM 
CRIMINAL DISTRICT COURT NO. 1 OF TARRANT COUNTY
 
------------
 
OPINION
 
------------
        Appellant 
Michael Alexander Gordon a/k/a Michael A. Gordon appeals from his conviction for 
criminally negligent homicide. In two points, he contends that the evidence is 
legally and factually insufficient to prove that he used or exhibited a deadly 
weapon in the commission of the offense. We affirm.
Procedural Background
        After 
B.C., the son of appellant’s girlfriend, was seriously injured and 
subsequently died after being in appellant’s care, appellant was indicted for 
capital murder and injury to a child by striking the child with or against “an 
object unknown to the grand jury, that in the manner of its use or intended use 
was capable of causing death or serious bodily injury.”  A jury found 
appellant guilty of the lesser-included offense of criminally negligent 
homicide.[1]  The jury also found that appellant 
used a deadly weapon in committing the offense.  On appeal, appellant 
challenges the legal and factual sufficiency of the deadly weapon finding.
Standards of Review
Legal 
Sufficiency
        In 
reviewing the legal sufficiency of the evidence to support a conviction, we view 
all the evidence in the light most favorable to the verdict in order to 
determine whether any rational trier of fact could have found the essential 
elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 
443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Ross v. State, 133 S.W.3d 
618, 620 (Tex. Crim. App. 2004). This standard gives full play to the 
responsibility of the trier of fact to resolve conflicts in the testimony, to 
weigh the evidence, and to draw reasonable inferences from basic facts to 
ultimate facts. Jackson, 443 U.S. at 319, 99 S. Ct. at 2789.  The 
trier of fact is the sole judge of the weight and credibility of the evidence.  
See Tex. Code Crim. Proc. Ann. 
art. 38.04 (Vernon 1979); Margraves v. State, 34 S.W.3d 912, 919 (Tex. 
Crim. App. 2000).  Thus, when performing a legal sufficiency review, we may 
not re-evaluate the weight and credibility of the evidence and substitute our 
judgment for that of the fact finder.  Dewberry v. State, 4 S.W.3d 
735, 740 (Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000).  
We must resolve any inconsistencies in the evidence in favor of the verdict.  
Curry v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).
Factual 
Sufficiency
        In 
reviewing the factual sufficiency of the evidence to support a conviction, we 
are to view all the evidence in a neutral light, favoring neither party.  See 
Zuniga v. State, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004).  The only 
question to be answered in a factual sufficiency review is whether, considering 
the evidence in a neutral light, the fact finder was rationally justified in 
finding guilt beyond a reasonable doubt.  Id. at 484.  There 
are two ways evidence may be factually insufficient: (1) the evidence supporting 
the verdict or judgment, considered by itself, is too weak to support the 
finding of guilt beyond a reasonable doubt; or (2) when there is evidence both 
supporting and contradicting the verdict or judgment, weighing all of the 
evidence, the contrary evidence is so strong that guilt cannot be proven beyond 
a reasonable doubt. Id. at 484-85.  “This standard acknowledges 
that evidence of guilt can ‘preponderate’ in favor of conviction but still 
be insufficient to prove the elements of the crime beyond a reasonable doubt.”  
Id. at 485.  In other words, evidence supporting a guilty finding 
can outweigh the contrary proof but still be insufficient to prove the elements 
of an offense beyond a reasonable doubt.  Id.
        In 
performing a factual sufficiency review, we are to give deference to the fact 
finder’s determinations, including determinations involving the credibility 
and demeanor of witnesses.  Id. at 481; Cain v. State, 958 
S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment 
for that of the fact finder’s. Zuniga, 144 S.W.3d at 482.
Analysis
        Because 
our disposition of both points involves a discussion of the same facts, we will 
review them together.  A deadly weapon is “anything that in the manner of 
its use or intended use is capable of causing death or serious bodily injury.” 
Tex. Penal Code Ann. § 1.07(a)(17)(B) 
(Vernon Supp. 2004-05); Dotson v. State, 146 S.W.3d 285, 299 (Tex. 
App.—Fort Worth 2005, pet. ref’d).  An object qualifies as a deadly 
weapon if the actor intends a use of the object in which it would be capable of 
causing death or serious bodily injury.  Bailey v. State, 38 S.W.3d 
157, 159 (Tex. Crim. App. 2001); Dotson, 146 S.W.3d at 299. Anything 
which actually causes death is a deadly weapon. Tyra v. State, 897 S.W.2d 
796, 798 (Tex. Crim. App. 1995).
        A 
fact finder may affirmatively find that a deadly weapon was used even if the 
object is not identified.  Regan v. State, 7 S.W.3d 813, 819-20 
(Tex. App.—Houston [14th Dist.] 1999, pet. ref’d); Stanul v. State, 
870 S.W.2d 329, 333 n.3 (Tex. App.—Austin 1994, pet. ref’d); Mixon v. 
State, 781 S.W.2d 345, 346-47 (Tex. App.—Houston [14th Dist.] 1989), aff’d, 
804 S.W.2d 107, 108 (Tex. Crim. App. 1991) (adopting part of court of appeals’ 
opinion holding that deadly weapon finding may be made even if object not 
identified as its own).  The presence and severity of wounds on the injured 
party are factors to be considered in determining whether an object was used as 
a deadly weapon.  Bethel v. State, 842 S.W.2d 804, 807 (Tex. 
App.—Houston [1st Dist.] 1992, no pet.); Mixon, 781 S.W.2d at 347. A 
jury may consider all the facts of a case in determining whether a deadly weapon 
was used.  Bethel, 842 S.W.2d at 807.
        Appellant 
contends that there is no evidence in the record of the manner in which the 
unknown object was used; thus, the evidence is insufficient to prove that the 
object was a deadly weapon.  Appellant further contends that the evidence 
of B.C.’s injuries is equally consistent with other theories urged by 
appellant in which appellant did not use anything that caused injury to B.C.[2]
        The 
evidence at trial was as follows.  Julie Finberg, a police officer for the 
City of Fort Worth, testified that at 5:05 p.m. on May 19, 2002, she responded 
to a 911 hangup call at an apartment complex.  When she arrived at 
Apartment 126, she went inside and saw an eighteen-month-old child, B.C., lying 
on his back on the couch.  B.C. was pale, his back was arched, and he had 
“very sporadic breathing like it was very forced or labored.”  His eyes 
were open, but “it didn’t look like he could focus on anything that was 
going on around him.”  Officer Finberg did not see any other signs of 
injury on B.C. or any blood, nor did she see any blood on the couch.
        A 
man, whom Officer Finberg identified as appellant, was in the apartment when 
Officer Finberg arrived.  He told her that B.C. had fallen off the couch as 
he reached for something.  According to Officer Finberg, a fireman who 
overheard appellant’s explanation about B.C. falling off the couch turned to 
her and shook his head no.  Officer Finberg testified that the couch was 
about a foot or a foot and a half off the ground, and the floor was carpeted.
        Jessica 
C., B.C.’s mother, testified that she understood from the autopsy report that 
B.C. had died by being shaken and hit with a “blunt force object.”  
According to Jessica, the medical diagnosis she received indicated that B.C.’s 
injuries could have occurred by falling off the couch only “[i]f he hit his 
head more than once on something on the way down.”  But she then said 
that the diagnosis was that there was no way that B.C. could have sustained the 
injuries he did by falling off the couch.  Jessica testified that B.C. 
suffered three head fractures and a collapsed lung, that the back of his head 
was mushy or soft, that one of his eyes “would stay big and the other one was 
small,” and that he had a bruise on his back.
        Charles 
Olsen, who at the time of trial had been a paramedic for ten years, testified 
that when he first saw B.C., it did not appear that B.C.’s airway was blocked.  
B.C. was breathing, but his respirations were irregular.  B.C. also had 
decorticate posturing, which means that his extremities were drawn in towards 
the torso.  According to Olsen, decorticate posturing indicates a “high 
degree” of closed head injury.  B.C.’s right pupil was reactive to 
light, but his left pupil was “blown,” or widely dilated and nonresponsive 
to light.
        According 
to Olsen’s report from that day, one family member, a male, was in the 
apartment.  That person stated that B.C. fell off the couch about ten 
minutes before EMS was called and had been unconscious since then.  Olsen 
testified that B.C.’s injuries did not fit that scenario.  He further 
testified that at the time he examined B.C., he suspected shaken baby syndrome 
from the type of symptoms he noted, but he agreed with the prosecutor that a 
diagnosis of shaken baby syndrome requires “more investigation and testing and 
special instruments to look at various parts of the body and put in the eyes.”  
Olsen did not see anything on B.C.’s exterior that made him believe B.C. had 
been hit with or against an object.  B.C. had no external injuries.
        Dr. 
Daniel Konzelmann, a Tarrant County deputy medical examiner, performed the 
autopsy on B.C.  Dr. Konzelmann testified that with the exception of 
B.C.’s head injury, everything else internally appeared normal, and B.C. 
appeared to be healthy.  When Dr. Konzelmann removed B.C.’s scalp, he saw 
significant hemorrhaging in the subcutaneous tissue, about six to seven inches 
around, “mainly concentrated toward the back of the head.”  According 
to Dr. Konzelmann, this “galeal bruise,” which was located on the scalp 
outside of the skull, indicated “an impact.”
        In 
addition to the galeal bruise, Dr. Konzelmann found fractures on B.C.’s skull.  
One fracture was 2 1/8 inches long, Y-shaped, and centered over the right back 
of B.C.’s head.  A second complex fracture was located on the upper left 
back of B.C.’s head.  This fracture had branching; one branch extended 
almost to the front of B.C.’s skull around the eye, and its maximum length was 
about seven inches.  The two fractures did not meet.  According to Dr. 
Konzelmann, this indicated that B.C. had sustained two “distinct separate 
impacts” consistent with two or more blows to the head or with B.C.’s head 
being struck against an object twice or more.  Dr. Konzelmann did not see 
any distinct skin injuries on the side or the back of B.C.’s head.  Dr. 
Konzelmann also testified that B.C. had significant brain swelling and a left 
side subdural hemorrhage or hematoma between the skull and brain.
        Dr. 
Konzelmann testified that skull fractures are harder to cause in a child than in 
an adult because a child’s skull is growing and more flexible; thus, a child 
can sustain impacts from proportionately greater forces without suffering a 
fracture or life-threatening injury.  According to Dr. Konzelmann, 
“significant force” caused B.C.’s injuries.  Dr. Konzelmann testified 
that B.C.’s injuries were similar to injuries sustained by children who had 
been in a serious collision and ejected from a car or who had been run over by a 
car and struck in the head.  Dr. Konzelmann stated that B.C.’s injuries 
could not have occurred by falling or diving off of any part of the couch.
        When 
asked what kind of fall could have caused B.C.’s injuries, Dr. Konzelmann 
stated that it depended on several variables, that a fall from multiple stories 
could have caused the injuries, but that in this case he would expect only a 
single impact to occur from a single fall.  He said that it would be 
possible in an unusual circumstance for one fall to cause two distinct impacts, 
such as a fall onto “two distinct raised areas that aren’t sharp” but that 
he would expect that a single fall would lead to a single skull impact.
        Dr. 
Konzelmann opined that the cause of B.C.’s death was “[b]lunt force head 
injury,” which he agreed was consistent with being struck by or against a 
“blunt force object.”  Dr. Konzelmann explained the lack of external 
injuries on B.C., testifying that in ten to fifty percent of infants with severe 
injuries, no external injuries are visible.  Dr. Konzelmann could not say 
what exactly B.C. had been struck with or against, but he agreed it could have 
been a wall, floor, concrete patio, or something “heavy and flat.”  Dr. 
Konzelmann also agreed that whatever it was, it was a deadly weapon.
        On 
cross-examination, appellant asked Dr. Konzelmann whether B.C. could have been 
pushed down on the couch and then catapulted off onto the floor and hit his 
head.  Dr. Konzelmann responded that that “could have happened in this 
case.”  Although Dr. Konzelmann testified that he believed the skull 
fractures occurred around the same time, he admitted that they could have 
occurred up to twelve hours apart.
        On 
redirect examination, however, Dr. Konzelmann testified that the fractures, 
which appeared fresh, and the subdural hematoma and galeal bruising, all 
appeared to have occurred around the same time.  He also testified that 
B.C.’s injuries could not have come from a fall because if a child sustains a 
fracture as a result of a fall of ten feet or less, the child typically sustains 
only a short linear fracture, not a complex, branching fracture.  Dr. 
Konzelmann also rejected the theory that B.C. had sustained the injuries by 
being “spiked” or pushed onto the couch and then hitting his head after 
bouncing off.  According to Dr. Konzelmann, “the fracture type is wrong, 
fracture size is wrong[,] and there are two fractures.”  Dr. Konzelmann 
stated that although he had agreed with appellant’s counsel that certain other 
scenarios could have happened—such as B.C. bouncing off the couch and hitting 
his head—those scenarios were in addition to whatever caused B.C.’s complex, 
branching fractures.  He agreed that it is much more believable that B.C. 
was picked up by his legs or waist and swung into a blunt, flat object or that 
something was accelerated into his head.  He also reiterated that adults 
are much more likely to sustain a head injury in a fall than children.  Dr. 
Konzelmann further stated that it was not important to his findings whether B.C. 
was shaken or not.
        Detective 
Dennis Hutchins testified that he took appellant’s statement after B.C. had 
been taken to the hospital.  The pertinent parts of appellant’s statement 
are as follows:
 
[B.C.] and I went to the living room and were watching television [after Jessica 
went to work].  I left the front door open so that [B.C.] could play on the 
front porch.  At about 4:45 or 5:00 p.m., I heard [B.C.] crying on the 
front porch.  I went to check on him to make sure he was okay, and he was 
lying on his back crying.  I didn’t see any injuries so I picked him up 
and took him back inside.  For about five or ten minutes, I tried everying 
that I could think of to get [B.C.] to stop crying but nothing was working. I 
tried holding him; I tried giving him his cup and toys but he still continued to 
cry.
 
I 
was holding him facing me with my thumbs on [B.C.’s] chest and my hands 
wrapped around his back. I shook [B.C.] about three or four times trying to get 
him to stop crying.  I sat [B.C.] on the couch and he passed out.  I 
shook [B.C.] again in order to wake him up.  The second time I shook him 
was not hard enough to hurt him.
 
 
        Before 
Detective Hutchins took appellant’s statement, he had an affidavit from Dr. 
Michael Cowan who had examined B.C. at the hospital.  From Dr. Cowan’s 
affidavit, Detective Hutchins learned that B.C.’s left pupil was abnormally 
dilated, indicating a severe head injury, that B.C.’s retina was bleeding, 
that B.C. had suffered a subdural hematoma, and that B.C. had skull fractures 
and infarctions to the brain. Dr. Cowan’s affidavit was read into evidence:
 
Patient is an 18-month-old white male who presented by MedStar and was 
unresponsive upon arrival. According to paramedics who brought the patient to 
the hospital, he fell off the couch about 2 feet from the ground. The history of 
how the patient was injured was given to the paramedics by, quote, Michael. . . 
. Michael, end quote, was taking care of the patient at the time of the injury. 
. . .
. 
. . .
. 
. . The patient’s extensive head injuries are inconsistent with the 
patient’s history of falling such a short distance. In other words, the 
patient’s injuries are consistent with a significant impact or high energy 
force to the head to cause such an injury.
                . 
. . The findings on the head CT are consistent with that found [on] a patient 
that received a significant, quote, blow or, quote, force to the head.
 
Therefore, the history, as I know it at the present time, the patient falling 
off the couch, is wholly inconsistent with the patient’s injuries.  Based 
on my history and physical examination and the results of the head CT, this 
patient is a victim of an intentional injury, e.g., child, physical abuse.
 
        Brenda 
C., Jessica’s mother, described the area outside Apartment 126, which she 
shared with Jessica, appellant, and B.C.  Just outside the apartment was a 
concrete patio enclosed by a wooden fence with a gate.  According to 
Brenda, B.C. was not tall enough to open the gate.  Outside of the fence is 
a concrete sidewalk and above it a cement wall about six feet tall.  The 
parking area for the apartments is above the wall.  It is accessed by 
taking the sidewalk to a point where the wall tapers down and two steps lead up 
into the parking area.  The wall had a metal rail with bars about a foot 
and a half apart.
        Dr. 
Konzelmann was called to testify again for the defense.  When asked if 
there was a height he would have expected B.C. to have fallen from to cause the 
fractures, Dr. Konzelmann stated that he could explain the presence of one 
fracture that way, but “two fractures is a lot more difficult.”  He 
agreed that studies have shown that a fall from three stories, or roughly thirty 
to thirty-six feet, could cause a skull fracture, but Dr. Konzelmann did not 
know “what the fractures looked like” in the studies.  Dr. Konzelmann 
testified again that he did not think B.C.’s injuries occurred from a free 
fall and that if B.C. had simply hit his head after falling from a significant 
height, he would expect to see only one linear fracture rather than two complex, 
branching fractures.  He did agree that “under very specialized 
circumstances, one blow can cause two fractures.”  Dr. Konzelmann also 
reiterated that although he made some findings that overlap with “the classic 
description of a shaken infant,” B.C.’s injuries were not consistent with a 
shaken baby and that was not his diagnosis of cause of death because of the 
“[t]otal lack of hemorrhaging in the neck muscles as well as evidence of the 
significant impact.”
        On 
cross-examination, Dr. Konzelmann elaborated on his belief that B.C. did not 
sustain his injuries by falling, even from a significant height.  He agreed 
that if B.C. had fallen off a six foot wall, he probably would not have suffered 
a skull fracture.  He also testified that when children fall eight or ten 
feet, fewer than one to two percent sustain any kind of skull fracture, and if 
they do, the fracture is a simple, nonbranched linear fracture.  
Additionally, the fracture would not be as long as seven inches and would be 
closer to an inch or an inch and three quarters.  Dr. Konzelmann also 
testified that if B.C. had fallen onto exposed concrete, i.e., a sidewalk, he 
would expect to see an abrasion on B.C.’s skin because concrete is rough. He 
did not see an abrasion on B.C.’s skin.
        Based 
on the record evidence and applying the appropriate standards of review, we hold 
that the evidence is both legally and factually sufficient to support the 
jury’s deadly weapon finding.  In a case such as this, in which a child 
is injured while in the care of one person and there are no witnesses as to what 
occurred to cause the child’s injury, the primary evidence of the manner of 
use of an object causing injury or death is evidence about the severity, scope, 
and nature of the child’s injuries.  See Stanul, 870 S.W.2d at 
330-31, 335; Roark v. State, No. 05-00-00584-CR, 2001 WL 1173916, at *6 
(Tex. App.—Dallas Oct. 5, 2001, pet. ref’d) (not designated for 
publication); Kanagas v. State, No. 14-98-00419-CR, 2000 WL 257767, at *3 
(Tex. App.—Houston [14th Dist.] Mar. 9, 2000, pet. ref’d) (not designated 
for publication); Robey v. State, No. 14-91-01029-CR, 1993 WL 282790, at 
*11 (Tex. App.—Houston [14th Dist.] July 29, 1993, pet. ref’d) (not 
designated for publication).
        Here, 
two doctors opined that B.C.’s injuries were consistent with being struck 
rather than falling.  Dr. Konzelmann never wavered from his conclusion that 
B.C.’s injuries could only have occurred from being struck with or against a 
heavy, flat object rather than falling, even from a significant height.  
Dr. Konzelmann’s findings were very specific: although he did agree that some 
of the defense’s proposed scenarios could have occurred, he also unequivocally 
stated that those scenarios would not have produced the injuries that caused 
B.C.’s death.  Dr. Konzelmann’s conclusions were based on studies, 
which he provided to the defense.  Appellant did not present any evidence 
contrary to Dr. Konzelmann’s testimony.  Factually, this case is 
substantially similar to those cases cited above in which medical testimony 
regarding the nature, severity, and scope of injury supports a jury’s deadly 
weapon finding. We overrule appellant’s first and second points.
        Having 
overruled both of appellant’s points, we affirm the trial court’s judgment.
  
   
                                                                  TERRIE 
LIVINGSTON
                                                                  JUSTICE
   
 
PANEL 
B:   LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.
 
PUBLISH
 
DELIVERED: 
September 8, 2005

 
NOTES
1.  
This offense was included in the court’s charge at appellant’s request.
2.  
Appellant also contends that the mens rea for the offense, negligence, is 
inconsistent with a deadly weapon finding, which requires evidence of intent.  
But an object is not a deadly weapon because the actor intends to cause the 
result, i.e., death or serious bodily injury; “intent” in the context of a 
deadly weapon refers to the actor’s intended use of the object.  See 
Dotson, 146 S.W.3d at 299.  An object is a deadly weapon if “the 
actor intends a use of the object in which it would be capable of causing death 
or serious bodily injury.”  Id.