BUTLER V. STATE

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-05-311-CR

LEE THOMAS BUTLER APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 3 OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I.  Introduction

Appellant Lee Thomas Butler appeals his conviction and nine-year sentence for aggravated assault with a deadly weapon.  In his first point, appellant contends that the trial court committed reversible error by failing to charge the jury on the lesser-included offense of assault with bodily injury.  In appellant’s second and third points, he complains that the evidence is factually insufficient to support a guilty verdict and a deadly weapon finding.  We affirm.

II.  Background Facts

On September 22, 2003, at approximately 12:00 p.m., Robby Trevino and his wife, Laurie Reed, were in downtown Fort Worth, Texas to go to lunch. As they were walking down Third Street, Trevino noticed an apple on the sidewalk.  
Then appellant walked up to the apple and stepped on it, splattering Reed’s dress and hair with chunks of apple.  Trevino began yelling at appellant.  Although appellant’s version of what happened next differs from Trevino’s and Reed’s, all agree that appellant stabbed Trevino.  After the stabbing, Trevino saw the knife in appellant’s hand.  When the police searched appellant, he had a wallet and credit cards that belonged to another person whom appellant admitted he did not know.

Appellant was indicted for two counts of aggravated assault with a deadly weapon.  Count one charged appellant with assaulting Trevino, and count two charged him with assaulting Reed.  On July 27, 2005, the jury found appellant guilty of count one, assaulting Trevino, and found appellant not guilty of count two, assaulting Reed.  
On July 29, 2005, the trial court assessed his punishment at nine years in the Institutional Division of the Texas Department of Criminal Justice. 

III.  Factual Sufficiency-Affirmative Defense of Insanity

In appellant’s second point,
(footnote: 2) he contends that the jury’s rejection of his affirmative defense of insanity is so against the great weight and preponderance of the evidence as to be manifestly unjust.

A.  Applicable Law

Penal code section 8.01(a) provides that a person is insane if “at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong.”  
Tex. Penal Code Ann.
 § 8.01(a) (Vernon 2003).  Although jurors may not arbitrarily disregard expert testimony as to insanity, neither may they give conclusive effect to such testimony.  
Graham v. State
, 566 S.W.2d 941, 951 (Tex. Crim. App. 1978).  The circumstances of the crime itself are also important in determining the mental state of the accused at the commission of the offense.  
Id
. at 951.

B.  Standard of Review

Insanity is an affirmative defense to prosecution.  
Tex. Penal Code Ann.
 § 8.01(a).  The defendant has the burden of proving an affirmative defense by a preponderance of the evidence. 
 
Id. 
§ 2.04(d) (Vernon 2003).  

Therefore, upon review of this point, we must consider all the evidence relevant to the issue of insanity and determine whether the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust.  
Meraz v. State
, 785 S.W.2d 146, 155 (Tex. Crim. App. 1990).  In our review, we may not usurp the function of the jury by substituting our judgment in the place of its verdict.  
See id. 
at 154.  We may only sustain this point if, after detailing the relevant evidence and stating in what regard the contrary evidence greatly outweighs the evidence supporting the verdict, we also clearly state why the verdict is so against the great weight of the evidence as to be manifestly unjust, why it shocks the conscience, or why it clearly demonstrates bias.  
Id. 
at 154 n.2; 
see Clewis v. State
, 922 S.W.2d 126, 135-36 (Tex. Crim. App. 1996).

C. Analysis

It is undisputed that appellant is a paranoid schizophrenic and that at the time of the stabbing, he had a severe mental disease or defect.  The issue here is whether, as a result of his paranoid schizophrenia, appellant knew stabbing Trevino was wrong.

Trevino testified that he and Reed were walking eastbound on the north side of Third Street when they encountered appellant.  Before appellant stomped on the apple, he had been laughing and joking with another man who disappeared.  Trevino couldn’t say whether appellant’s eyes were “crazy looking” after appellant stepped on the apple and confronted Trevino,  but Trevino said that appellant did appear to be mad.
(footnote: 3)  Just before appellant stabbed Trevino, he “put his head around [Trevino’s] head leaning his shoulder into [Trevino]” as if he were going to put his head on Trevino’s shoulder.
(footnote: 4)  Trevino testified that after the stabbing, he pretended he had a weapon.  Although appellant did not seem to demonstrate any fear or concern before stabbing Trevino, he did appear scared when Trevino acted as if he had a weapon. 

Trevino also testified that he has some experience with mental illness because one of his children is borderline schizophrenic and has manic episodes.  In Trevino’s opinion, appellant knew what he was doing when he stabbed Trevino and knew that his actions were wrong. 

Reed testified that when appellant confronted Trevino, he stared right at him and looked angry.  
Reed said that after appellant stabbed Trevino, he turned to her and, with the knife in his hand, said “I will kill you too.” 
 She also said that after the stabbing, appellant walked backwards across Third Street with the knife still in his hand up in the air about head level.  On cross-examination, Reed admitted she had told the police in her statement that appellant “had crazy looking eyes darting out everywhere . . . .  [H]e looked like he was looking to see who was going to try to tackle him for his knife.” 

David Whitney did not witness the stabbing, but he did see what happened afterward.  He testified that appellant was wandering back across Third Street, and people were getting out of his way.  According to Whitney, appellant was just carrying the knife and did not appear to be threatening anyone with it.  Whitney’s friend Tucker Davis got appellant to the ground.  Trevino had come back toward appellant at that point and was yelling at him.  Appellant was talking “nonstop,” and Whitney thought he was acting “kind of crazy.”

Davis testified that when he saw appellant, appellant was walking eastbound on the south side of Third Street and then decided to turn northbound to cross the intersection at Third and Houston Streets.  Davis walked up behind appellant, and appellant sensed that Davis was there.  Appellant turned around with the knife out and said, “[D]o you want a piece of me?”  Davis told appellant he just wanted to talk.  He also told appellant that he was a black belt in tae kwon do and said he would harm appellant if appellant did not give him the knife.  Appellant was not being aggressive; he seemed to calm down.  Appellant then let Davis take the knife.  He looked Davis in the eye and calmly asked if Davis was a police officer, but Davis did not answer.

Davis put appellant on the ground to wait for a police officer.  Appellant did not fight or struggle.  When Trevino came over, he and appellant yelled at each other, and appellant began to talk rapidly.  Davis explained that he might have told the police that appellant was “psychobabbling” because he was talking so fast.  Davis sensed that appellant was still very angry with Trevino and it did not help that Trevino was yelling at him.  It appeared the two were having an understandable conversation.

Terry Briggs, a City Center security officer, testified that when he responded to the disturbance, Davis had the knife with blood on it, so Briggs handcuffed appellant.  He asked appellant if he had any more weapons, and appellant answered “[a] very clear no without any hesitation.”  Briggs testified that appellant and Trevino were both agitated and were having a heated conversation, but appellant was not rambling.  He did not appear crazy or insane, just agitated. 

Tami Robinson, a Fort Worth police officer testified that when she responded to the scene, appellant was attempting to explain his actions to anybody who would listen. 

Detective James Desmarais, also with the Fort Worth police department, testified that he interviewed appellant after the stabbing.  Appellant admitted being in the downtown area and stepping on the apple, but he denied getting any of it on anyone.  According to Detective Desmarais, appellant appeared to understand his 
Miranda
 rights.  Appellant told Detective Desmarais that Trevino cussed him and used bad language, so appellant started walking towards him.  He said Trevino started backing away, and appellant thought he was reaching for a weapon, so he stabbed him for fear of his safety.  Appellant did not tell Detective Desmarais that he had met Trevino and Reed before or that Trevino had previously threatened appellant. 

Detective Desmarais said that all of appellant’s answers were coherent and appropriate, and they were having normal conversation and eye contact.  Then, appellant’s demeanor changed, he broke off the eye contact, turned to the left, and started having a conversation for about twenty seconds or so with someone who was not there.  Appellant then went back to normal.  He told the detective that he was supposed to be on medication, but he was not taking it.  After appellant’s conversation with an imaginary person, Detective Desmarais terminated the interview.

Appellant testified that he took Prolixin but that he had been off his medication for about two months when he arrived in Fort Worth.  According to appellant, he saw Trevino earlier on September 22 in line at First United Methodist Church where they give away free lunches.  Appellant testified that he and Trevino argued, but nothing else happened.  Appellant said that he ate his lunch on one of the benches off Throckmorton and that he was by himself. 

According to appellant, when he finished his lunch, he crossed the street.  He had an apple in his hand, and it rolled out of his hand.  A woman asked appellant if he tried to hit her with the apple, and he said no.  Appellant testified that the woman told him Trevino and Reed were talking to him, then he smashed the apple.  Appellant said the apple was right underneath his foot, and nothing got on Reed or Trevino; they were three or four feet away.  According to appellant, Trevino used profanity, and Trevino and Reed started circling him.  Appellant testified that Trevino came toward him, put his hands in his pocket, and said he would kill appellant.  When Trevino took his hands out of his pocket, there was nothing there, but appellant had already stabbed Trevino by then. 

Appellant said he did not mean to hurt Trevino and he was just trying to defend himself.  He also said that he did not try to run away afterward.  He gave Davis the knife because he thought Davis was a police officer; although Davis did not answer when appellant asked him if he was an officer, appellant said that Davis moved his head as if to say yes. 

Appellant testified that he did not think he did anything wrong that day.  In response to cross-examination, appellant admitted that it would have been wrong to start a fight with Trevino if he had been in the lunch line at the church, to throw the apple on the woman on the street, and to have stabbed Trevino if Trevino had not threatened him first, as appellant believed. 

Appellant did not remember telling Detective Desmarais that he walked toward Trevino first, that he turned to face Reed because he doesn’t like women disrespecting him, or that he had a conversation with an imaginary person.  Appellant acknowledged that he and the detective were the only people in the room during the interview. 

Several of appellant’s family members testified that he has a long history of mental illness and that he would act bizarrely and sometimes violently when off his medication.  For instance, several testified that they had seen appellant in the front yard dressed in “army clothes” and acting as if he were a soldier.
(footnote: 5)  They also testified that appellant traveled a lot, especially when he was off his medication, and that they did not see him consistently.  

Appellant’s brother testified that appellant “doesn’t always act . . . as though he know[s] who you are” when he is off his medication and that he has in the past, when off his medication, acted as if he knew someone when he did not or described things that happened to him that were not true.  According to appellant’s brother, when appellant is off his medication, you can talk to him, but he does not act rationally.  For instance, one time appellant set a fire in the middle of the floor in his apartment because he was cold, even though he had a heater.  Appellant did not seem to understand why his actions were inappropriate. 

Appellant’s sister testified that when she saw appellant in jail after the stabbing, he was still a little disoriented even though he was taking medication.  He told her that “they were picking on him and he just had to defend himself.”  Appellant told his sister that he had been at a shelter and a man told him he was going to kill him and reached for his back pocket; appellant thought the man was going to get a weapon, so appellant pulled his knife.  Appellant’s sister said that when appellant was off his medication, he talked to people who weren’t there and didn’t seem to know he was doing anything wrong.  Another of appellant’s sisters testified that appellant did not think any of the strange things he did were wrong. 

Dr. Lisa Clayton, a psychiatrist, testified that she examined appellant to determine if he was sane at the time of the offense.  She stated that she interviewed appellant on November 6, 2004.  Dr. Clayton testified that when she saw appellant, he was on antipsychotic medicine and appeared to be rational and lucid.  After reviewing appellant’s medical records, Dr. Clayton stated that she believed appellant had been hearing voices in the past before he was given medication for his schizophrenia.  She testified that she did not believe that appellant knew that stabbing Trevino was wrong and that she believed all of appellant’s actions were consistent with that opinion.  Dr. Clayton stated that she believed that appellant was under the “paranoid delusional belief that [Trevino] was trying to kill him.”  She testified that appellant thought that he was defending himself against Trevino and that he was delusional.  According to Dr. Clayton, appellant could appreciate right from wrong but not in connection with his actions toward Trevino because he was delusional about Trevino; in other words, he truly believed he was acting in self-defense. 

Dr. Clayton believed that appellant’s actions after the stabbing likewise did not indicate a consciousness of guilt; she believed that appellant simply thought that once he negated Trevino as a threat, he left the area.  In forming her opinion, Dr. Clayton did not speak with the officers or other witnesses; she based her opinion on her interview with appellant, her review of his medical records and the police report, and a five to ten minute interview with one of appellant’s jailers. 

Dr. Stephen Karten, a clinical psychologist and the State’s expert witness, testified that he believed appellant was sane at the time of the offense.  Dr. Karten explained how he recreated the scene to help him make inferences about appellant’s state of mind at the time of the stabbing.  In forming his opinion, Dr. Karten reviewed the police report, Trevino’s medical records, the indictment, psychological evaluations of appellant evaluating his competency to stand trial, and Dr. Clayton’s report.  He also interviewed appellant, some of appellant’s brothers and sisters, Trevino, Detective Desmarais, and appellant’s mother. 

Dr. Karten prepared a table with appellant’s actions on one side and a description on the other side of the inferences of appellant’s awareness of right and wrong that could be made from those actions.  He pointed to appellant’s stabbing Trevino, his attempted flight, and his possessing another person’s wallet and credit cards when he was arrested as evidence that he was sane.
(footnote: 6) According to Dr. Karten, appellant’s actions showed a high degree of good judgment because on the street “you get them before they get you.”  Dr. Karten agreed that appellant’s leaning into Trevino before stabbing him—which the prosecutor characterized as appellant seeming to be hiding the fact that he was getting out the knife—is consistent with his determination that appellant was sane because it shows planning and an awareness of taking someone by surprise.  Appellant did not tell Dr. Karten that he had argued with Trevino earlier at the church.  Dr. Karten said that appellant “knew what he was doing [was] wrong and [that] there was a consistent sense of justifying his behavior.” 

Appellant contends that Dr. Karten agreed that appellant might not have known right from wrong because he did not run away after the stabbing as Dr. Karten had assumed.
(footnote: 7)  However, even though Dr. Karten agreed that the fact that appellant walked away instead of running “tinkers” with his assessment a little, he nevertheless stated that he believed appellant was sane at the time of the assault.

Appellant points to the testimony of his family and Dr. Clayton, and to Dr. Karten’s admission that it would “tinker” with his opinion if appellant had not attempted to run away, to support his contention that the evidence is factually insufficient to support the jury’s rejection of his insanity defense.  However, after reviewing the evidence, we cannot say that the verdict is so contrary to the great weight and preponderance of the evidence that it is manifestly unjust.  
See Meraz
, 785 S.W.2d at 155.

The witness testimony regarding appellant’s behavior before and after the stabbing is as consistent with a finding that appellant was sane as with a finding that he was insane.
(footnote: 8)  For example, Trevino and Reed both testified that appellant was the initial aggressor; Trevino, Whitney, and Davis testified that appellant was leaving the scene even though he was not running, indicating consciousness of guilt; appellant was initially aggressive with Davis
(footnote: 9) until Davis told him he was a black belt and threatened to harm him; appellant asked Davis if he was a police officer and complied when he thought Davis indicated that he was; and appellant omitted his version of the facts when talking to Detective Desmarais and Dr. Karten.

Additionally, although both experts agreed that appellant was suffering from a mental disease or defect at the time, they disagreed over his awareness of right and wrong.  Appellant’s argument that Dr. Karten’s opinion should be given less weight because he assumed that appellant ran away when he did not fails to take into account testimony that appellant was leaving the scene with the knife in his hand even though he was not running.  A reasonable inference from Dr. Karten’s testimony is that although appellant did not “run” away, Dr. Karten still believed that appellant’s leaving the scene showed an intent to flee.

Appellant contends that the facts of this case are similar to the facts in the following cases:  
Van Guilder v. State
, 674 S.W.2d 915 (Tex. App.—San Antonio 1984), 
aff’d
, 709 S.W.2d 178 (Tex. Crim. App. 1985),
(footnote: 10) 
cert. denied
, 476 U.S. 1169 (1986); 
Baker v. State
, 682 S.W.2d 701 (Tex. App.—Houston [1st Dist.] 1984), 
rev’d
, 707 S.W.2d 893 (Tex. Crim. App. 1986); and 
Ex parte Schuessler
, 846 S.W.2d 850 (Tex. Crim. App. 1993).  According to appellant, those cases stand for the proposition that “when everyone basically says that a person is insane, the evidence is insufficient for conviction.” 

Although the court of criminal appeals affirmed the intermediate appellate court’s opinion in 
Van Guilder
, it disapproved of its use of a factual sufficiency standard of review on the ground that the intermediate appellate courts of this state do not have jurisdiction to consider the factual sufficiency of the jury’s rejection of an affirmative defense.  
Van Guilder
, 709 S.W.2d at 180-81, 183.  It reversed the intermediate appellate court’s holding in 
Baker
 on the same ground.  
Baker
, 707 S.W.2d at 894.  But the court of criminal appeals later rejected those holdings in 
Meraz
, which mandates the same standard of review employed by the intermediate appellate courts in 
Van Guilder
 and 
Baker
.  785 S.W.2d at 155.  Thus, those cases are instructive; however, we find them distinguishable.

In 
Van Guilder
, the defense offered the testimony of five medical experts who all agreed that the appellant was insane on the date of the offense, but the State offered no evidence to rebut the appellant’s insanity claim.  709 S.W.2d at 179.  In addition, the prosecutor told the trial court on the record, outside the jury’s presence, that a psychiatrist hired by the State had agreed with the defense experts that appellant was insane when she committed the offense.  
Id
. at 182.

In 
Baker
, two psychiatrists hired by the defense, the appellant’s mother, and one of his brothers all testified unequivocally that the appellant was insane at the time of the offense.  682 S.W.2d at 708.  The State offered the testimony of four officers regarding appellant’s behavior after his arrest but did not offer any medical testimony.  
Id
.

In 
Ex parte Schuessler
, a post-
Meraz
 opinion, the court of criminal appeals vacated its judgment reversing the opinion of the El Paso Court of Appeals, which had determined that the evidence was factually insufficient to support the jury’s rejection of the appellant’s affirmative defense of insanity.  846 S.W.2d at 853.  In 
Schuessler v. State
, the defense “produced overwhelming evidence of insanity,” which the State rebutted with the testimony of two jailers regarding appellant’s behavior three months after the offense and an expert who “credited the testimony of [the defense] witnesses[, and] . . . . diagnosed [the appellant’s] condition as one of acute psychosis, prior to, contemporaneous with, and antecedent to the murder [, but who] . . . withheld . . . any conclusion as to legal insanity at the moment the act was committed.”  647 S.W.2d 742, 749 (Tex. App.—El Paso 1983), 
rev’d
, 719 S.W.2d 320 (Tex. Crim. App. 1986) (op. on reh’g).

Here, the State offered evidence regarding appellant’s behavior at the time of the offense in addition to medical testimony.  Thus, 
Van Guilder, Baker
,
 and 
Schuessler
 are all distinguishable.  We hold that the evidence was factually sufficient to support the jury’s rejection of appellant’s affirmative defense of insanity.

We overrule appellant’s second point.

IV.  Factual Sufficiency

In his third point, appellant complains that the evidence is factually insufficient to support the deadly weapon finding.

A.  Standard of Review

In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party.  
See Zuniga v. State
, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004).  The only question to be answered in a factual sufficiency review is whether, considering the evidence in a neutral light, the fact finder was rationally justified in finding guilt beyond a reasonable doubt.  
Id
. at 484.  There are two ways evidence may be factually insufficient:  (1) when the evidence supporting the verdict or judgment, considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt; or (2) when there is evidence both supporting and contradicting the verdict or judgment and, weighing all of the evidence, the contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt.  
Id
. at 484-85.  “This standard acknowledges that evidence of guilt can ‘preponderate’ in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt.”  
Id
. at 485.  In other words, evidence supporting a guilty finding can outweigh the contrary proof but still be insufficient to prove the elements of an offense beyond a reasonable doubt.  
Id
. 

In performing a factual sufficiency review, we are to give deference to the fact finder’s determinations, including determinations involving the credibility and demeanor of witnesses.  
Id.
 at 481; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for the fact finder’s.  
Zuniga, 
144 S.W.3d at 482.  

A proper factual sufficiency review requires an examination of all the evidence.  
Id
. at 484, 486-87.  An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant’s complaint on appeal.  
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

B.  Applicable Law

A deadly weapon is “anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.”  
Tex. Penal Code Ann
. § 1.07(a)(17)(B) (Vernon Supp. 2006); 
Gordon v. State
, 173 S.W.3d 870, 873 (Tex. App.—Fort Worth 2005, no pet.); 
Dotson v. State
, 146 S.W.3d 285, 299 (Tex. App.—Fort Worth 2005, pet. ref’d).  An object qualifies as a deadly weapon if the actor intends a use of the object in which it would be capable of causing death or serious bodily injury.  
Bailey v. State
, 38 S.W.3d 157, 159 (Tex. Crim. App. 2001); 
Gordon
, 173 S.W.3d at 873; 
Dotson
, 146 S.W.3d at 299.

C.  Analysis

Appellant contends that the only evidence about his use of the knife came from his and Trevino’s testimony, which shows that Trevino was stabbed in the arm and that Trevino left the emergency room without treatment because he got tired of waiting.

Trevino testified that appellant stabbed him in the chest with a knife.  A photograph of Trevino’s wound shows that it was in his left upper chest, near his shoulder and arm.  After being stabbed, Trevino saw that his shirt was torn and blood was running down his chest.  
Trevino stated that he was in pain for several days after being stabbed and that his arm “was stiff to the point to where it was hard to move it without hurting real bad.”

Trevino estimated that the blade of the knife was approximately four to six inches long but could be shorter; appellant told Detective Desmarais that the knife was three and one-half inches long.  Appellant testified that he stabbed Trevino but that
 he did not intend to injure or kill Trevino. 

Officer Robinson testified that when she arrived at the scene, she saw appellant sitting on the sidewalk at the corner of Houston and Third Streets. Officer Robinson testified that she found a knife on the ground next to appellant.  She stated that the knife was capable of causing death or serious bodily injury.  Detective Desmarais also testified that the knife appellant used to stab Trevino was capable of causing serious bodily injury.

Appellant contends that the knife was not deadly because Trevino refused medical treatment.  However, 
section 1.07(a)(17)(B) does not make a deadly weapon finding contingent on the victim’s willingness to get help for his injuries.  
See 
Tex. Penal Code Ann.
 § 1.07(a)(17)(B).

Moreover,
 although Trevino testified that he initially refused to go to the hospital in an ambulance, the paramedics convinced him he should go anyway because they did not know how badly he had been cut and because “[w]here it was, it could have been bad.”  At the hospital, he told the nurse he wanted to leave, but a doctor came into the room and told him that depending on the results of the x-rays, he might have to go to surgery “in the next few minutes.”  Contrary to appellant’s contention that Trevino refused medical treatment, Trevino received four stitches. 

Appellant further complains that the evidence is factually insufficient to establish that the knife was deadly because he testified that he did not intend to injure or kill Trevino.  However, 
the court of criminal appeals has held that not all deadly weapons need be used with an intent to achieve a specific purpose.  
Walker v. State
, 897 S.W.2d 812, 814 (Tex. Crim. App. 1995); 
Thomas v. State
, 821 S.W.2d 616, 620 (Tex. Crim. App.1991).  What matters is whether the use or intended use of the weapon is capable of causing death or serious bodily injury.  
Walker
, 897 S.W.2d at 814.

Appellant admitted that he stabbed Trevino.  
The force he used was enough to cause blood to run down Trevino’s chest.  Trevino and two officers all testified that the knife was capable of causing serious bodily injury or death.  The paramedics and a doctor were all concerned because of the location of the wound and because they could not initially tell how deep it was.  Reed testified that an emergency room physician told her that because of her size, she would have died “on the street” from the same stab wound.  Thus, the evidence showed that appellant’s intended use of the knife was capable of causing serious bodily injury or death.
(footnote: 11)
 We hold that, when viewed neutrally, the evidence is not so obviously weak or so greatly outweighed by contrary proof that it would not support the deadly weapon finding beyond a reasonable doubt.  
Thus, we overrule appellant’s third point.

V.  Lesser-Included Offense

In appellant’s first point, he contends that the trial court abused its discretion by failing to charge the jury on the lesser-included offense of assault with bodily injury.

A.  Standard of Review

We use a two-pronged test to determine whether a defendant is entitled to an instruction on a lesser-included offense.  
Rousseau v. State
, 855 S.W.2d 666, 672-73 (Tex. Crim. App.), 
cert. denied
, 510 U.S. 919 (1993); 
Royster v. State
, 622 S.W.2d 442, 446 (Tex. Crim. App. [Panel Op.] 1981) (op. on reh’g).  First, the lesser-included offense must be included within the proof necessary to establish the offense charged.  
Salinas v. State
, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005);  
Rousseau
, 855 S.W.2d at 672-73; 
Royster
, 622 S.W.2d at 446.  Second, some evidence must exist in the record that would permit a jury to rationally find that if appellant is guilty, he is guilty only of the lesser offense.  
Salinas
, 163 S.W.3d at 741; 
Rousseau
, 855 S.W.2d at 672-73; 
Royster
, 622 S.W.2d at 446. 

B.  Applicable Law

Section 22.01 of the penal code defines the offense of assault.  
Tex. Penal Code Ann
.
 § 22.01 (
Vernon Supp. 2006
).  
Section 22.01(a)(1) states that a person commits assault if he “intentionally, knowingly, or recklessly causes bodily injury to another, including the person’s spouse.”  
Id. § 
22.01(a)(1).  A person commits the offense of aggravated assault if he intentionally, knowingly, or recklessly causes bodily injury to another and “uses or exhibits a deadly weapon during the commission of the assault.”  
Id.
 § 22.02(
a
)(2). 

C.  Analysis

Because the State concedes that assault is a lesser-included offense of aggravated assault with a deadly weapon, our sole inquiry is to determine if 
some evidence exists that would permit a jury to rationally find appellant guilty only of the lesser offense of assault
.  
Rousseau
, 855 S.W.2d at 672-73
.  Thus, a lesser-included offense instruction was required if the record contains some evidence that appellant did not use or exhibit a deadly weapon.  
Moreno v. State
, 38 S.W.3d 774, 778 (Tex. App.—Houston [14th Dist.] 2001, no pet.).   It is undisputed that appellant testified that he purposefully stabbed Trevino with a knife.  We have determined that the evidence supports the conclusion that the knife was a deadly weapon.  Trevino testified that he saw the knife in appellant’s hand after he used it.

Appellant contends that he was entitled to an instruction on the lesser-included offense because he testified that he did not intend to kill or cause serious bodily injury to Trevino, and Trevino refused to stay in the hospital for treatment.  As we have explained above, appellant’s lack of intent to kill or cause serious bodily injury is irrelevant to this issue.  Appellant testified that he intended to stab appellant with the knife to protect himself; therefore, he intended to cause bodily injury.
(footnote: 12)  In addition, there is no evidence in the record that Trevino refused medical treatment; to the contrary, the evidence shows that Trevino received four stitches.  Accordingly, we hold that no evidence exists in the record that would have permitted the jury to rationally find that appellant was guilty only of the lesser-included offense of assault with bodily injury.  We overrule appellant’s first point.

VI.  Conclusion

Having overruled appellant’s three points, we affirm the trial court’s judgment.

TERRIE LIVINGSTON

JUSTICE

PANEL A: LIVINGSTON, HOLMAN, and WALKER, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED: September 21, 2006

FOOTNOTES
1:
See 
Tex. R. App. P.
 47.4.

2:
For convenience of discussion, we will address appellant’s points out of order.

3:
Trevino did not clarify whether he meant “mad” as in angry  or “mad” as in mentally impaired, but from the context of his testimony, it appears he meant that appellant looked angry.

4:
Reed said that appellant “leaned in really far to where his head was . . .  beside [Trevino’s] head.” 

5:
Appellant testified that he remembered doing this and that he thought people were shooting at him.

6:
Appellant testified that he had found the wallet and cards and that he told the police that he was either going to “turn them in” or throw them away. 

7:
Evidence of flight shows a consciousness of guilt.  
Bigby v. State
, 892 S.W.2d 864, 884 (Tex. Crim. App. 1994), 
cert. denied
, 515 U.S. 1162 (1995).

8:
Contrary to appellant’s contention, Dr. Karten’s testimony was not the only evidence pointing to appellant’s sanity at the time of the offense.

9:
This evidence conflicts with Dr. Clayton’s opinion that appellant was only delusional about Trevino.

10:
The court of criminal appeals overruled its opinion in 
Van Guilder
 in 
Meraz
.  785 S.W.2d at 155.

11:
Appellant never contended that he did not intend to stab Trevino, only that the stabbing was justified.

12:
A person cannot accidentally or recklessly act in self-defense.  
See Martinez v. State
, 16 S.W.3d 845, 848 (Tex. App.—Houston [1st Dist .] 2000, pet. ref’d); 
Avila v. State
, 954 S.W.2d 830, 843 (Tex. App.—El Paso 1997, pet. ref’d); 
Johnson v. State
, 915 S.W.2d 653, 659 (Tex. App.—Houston [14th Dist.] 1996, pet. ref’d).  The jury was instructed on self-defense, but appellant has not challenged the jury’s rejection of that defense.