GORDON V. STATE

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-160-CR

MICHAEL ALEXANDER GORDON APPELLANT

A/K/A MICHAEL A. GORDON

V.

THE STATE OF TEXAS STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 1 OF TARRANT COUNTY

------------

OPINION

------------

Appellant Michael Alexander Gordon a/k/a Michael A. Gordon appeals from his conviction for criminally negligent homicide.  In two points, he contends that the evidence is legally and factually insufficient to prove that he used or exhibited a deadly weapon in the commission of the offense.  We affirm.

Procedural Background

After B.C., the son of appellant’s girlfriend, was seriously injured and subsequently died after being in appellant’s care, appellant was indicted for capital murder and injury to a child by striking the child with or against “an object unknown to the grand jury, that in the manner of its use or intended use was capable of causing death or serious bodily injury.”  A jury found appellant guilty of the lesser-included offense of criminally negligent homicide.
(footnote: 1)  The jury also found that appellant used a deadly weapon in committing the offense.  On appeal, appellant challenges the legal and factual sufficiency of the deadly weapon finding.  

Standards of Review

Legal Sufficiency

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Ross v. State
, 133 S.W.3d 618, 620 (Tex. Crim. App. 2004).  This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789.  The trier of fact is the sole judge of the weight and credibility of the evidence.  
See
 Tex. Code Crim. Proc. Ann.
 art. 

38.04 (Vernon 1979); 
Margraves v. State
, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact finder.  
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the evidence in favor of the verdict.  
Curry v. State
, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

Factual Sufficiency

In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party.  
See Zuniga v. State
, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004).  The only question to be answered in a factual sufficiency review is whether, considering the evidence in a neutral light, the fact finder was rationally justified in finding guilt beyond a reasonable doubt.  
Id
. at 484.  There are two ways evidence may be factually insufficient:  (1) the evidence supporting the verdict or judgment, considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt; or (2) when there is evidence both supporting and contradicting the verdict or judgment, weighing all of the evidence, the contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt.  
Id
. at 484-85.  “This standard acknowledges that evidence of guilt can ‘preponderate’ in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt.”  
Id
. at 485.  In other words, evidence supporting a guilty finding can outweigh the contrary proof but still be insufficient to prove the elements of an offense beyond a reasonable doubt.  
Id
.    In performing a factual sufficiency review, we are to give deference to the fact finder’s determinations, including determinations involving the credibility and demeanor of witnesses.  
Id.
 at 481; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for that of the fact finder’s.  
Zuniga, 
144 S.W.3d at 482.  

Analysis

Because our disposition of both points involves a discussion of the same facts, we will review them together.  A deadly weapon is “anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.”  
Tex. Penal Code Ann
. § 1.07(a)(17)(B) (Vernon Supp. 2004-05); 
Dotson v. State
, 146 S.W.3d 285, 299 (Tex. App.—Fort Worth 2005, pet. ref’d).  An object qualifies as a deadly weapon if the actor intends a use of the object in which it would be capable of causing death or serious bodily injury.  
Bailey v. State
, 38 S.W.3d 157, 159 (Tex. Crim. App. 2001); 
Dotson
, 146 S.W.3d at 299.  Anything which actually causes death is a deadly weapon.  
Tyra v. State
, 897 S.W.2d 796, 798 (Tex. Crim. App. 1995).

A fact finder may affirmatively find that a deadly weapon was used even if the object is not identified.  
Regan v. State
, 7 S.W.3d 813, 819-20 (Tex. App.—Houston [14th Dist.] 1999, pet. ref’d); 
Stanul v. State
, 870 S.W.2d 329, 333 n.3 (Tex. App.—Austin 1994, pet. ref’d); 
Mixon v. State
, 781 S.W.2d 345, 346-47 (Tex. App.—Houston [14th Dist.] 1989), 
aff’d
, 804 S.W.2d 107, 108 (Tex. Crim. App. 1991) (adopting part of court of appeals’ opinion holding that deadly weapon finding may be made even if object not identified as its own).  The presence and severity of wounds on the injured party are factors to be considered in determining whether an object was used as a deadly weapon.  
Bethel v. State
, 842 S.W.2d 804, 807 (Tex. App.—Houston [1st Dist.] 1992, no pet.); 
Mixon
, 781 S.W.2d at 347.  A jury may consider all the facts of a case in determining whether a deadly weapon was used.  
Bethel
, 842 S.W.2d at 807.

Appellant contends that there is no evidence in the record of the manner in which the unknown object was used; thus, the evidence is insufficient to prove that the object was a deadly weapon.  Appellant further contends that the evidence of B.C.’s injuries is equally consistent with other theories urged by appellant in which appellant did not use anything that caused injury to B.C.
(footnote: 2)
 The evidence at trial was as follows.  Julie Finberg, a police officer for the City of Fort Worth, testified that at 5:05 p.m. on May 19, 2002, she responded to a 911 hangup call at an apartment complex.  When she arrived at Apartment 126, she went inside and saw an eighteen-month-old child, B.C., lying on his back on the couch.  B.C. was pale, his back was arched, and he had “very sporadic breathing like it was very forced or labored.”  His eyes were open, but “it didn’t look like he could focus on anything that was going on around him.”  Officer Finberg did not see any other signs of injury on B.C. or any blood, nor did she see any blood on the couch. 

A man, whom Officer Finberg identified as appellant, was in the apartment when Officer Finberg arrived.  He told her that B.C. had fallen off the couch as he reached for something.  According to Officer Finberg, a fireman who overheard appellant’s explanation about B.C. falling off the couch turned to her and shook his head no.  Officer Finberg testified that the couch was about a foot or a foot and a half off the ground, and the floor was carpeted.  

Jessica C., B.C.’s mother, testified that she understood from the autopsy report that B.C. had died by being shaken and hit with a “blunt force object.”  According to Jessica, the medical diagnosis she received indicated that B.C.’s injuries could have occurred by falling off the couch only “[i]f he hit his head more than once on something on the way down.”  But she then said that the diagnosis was that there was no way that B.C. could have sustained the injuries he did by falling off the couch.  Jessica testified that B.C. suffered three head fractures and a collapsed lung, that the back of his head was mushy or soft, that one of his eyes “would stay big and the other one was small,” and that he had a bruise on his back.  

Charles Olsen, who at the time of trial had been a paramedic for ten years, testified that when he first saw B.C., it did not appear that B.C.’s airway was blocked.  B.C. was breathing, but his respirations were irregular.  B.C. also had decorticate posturing, which means that his extremities were drawn in towards the torso.  According to Olsen, decorticate posturing indicates a “high degree” of closed head injury.  B.C.’s right pupil was reactive to light, but his left pupil was “blown,” or widely dilated and nonresponsive to light. 

According to Olsen’s report from that day, one family member, a male, was in the apartment.  That person stated that B.C. fell off the couch about ten minutes before EMS was called and had been unconscious since then.  Olsen testified that B.C.’s injuries did not fit that scenario.  He further testified that at the time he examined B.C., he suspected shaken baby syndrome from the type of symptoms he noted, but he agreed with the prosecutor that a diagnosis of shaken baby syndrome requires “more investigation and testing and special instruments to look at various parts of the body and put in the eyes.”  Olsen did not see anything on B.C.’s exterior that made him believe B.C. had been hit with or against an object.  B.C. had no external injuries. 

Dr. Daniel Konzelmann, a Tarrant County deputy medical examiner, performed the autopsy on B.C.  Dr. Konzelmann testified that with the exception of B.C.’s head injury, everything else internally appeared normal, and B.C. appeared to be healthy.  When Dr. Konzelmann removed B.C.’s scalp, he saw significant hemorrhaging in the subcutaneous tissue, about six to seven inches around, “mainly concentrated toward the back of the head.”  According to Dr. Konzelmann, this “galeal bruise,” which was located on the scalp outside of the skull, indicated “an impact.” 

In addition to the galeal bruise, Dr. Konzelmann found fractures on B.C.’s skull.  One fracture was 2 1/8 inches long, Y-shaped, and centered over the right back of B.C.’s head.  A second complex fracture was located on the upper left back of B.C.’s head.  This fracture had branching; one branch extended almost to the front of B.C.’s skull around the eye, and its maximum length was about seven inches.  The two fractures did not meet.  According to Dr. Konzelmann, this indicated that B.C. had sustained two “distinct separate impacts” consistent with two or more blows to the head or with B.C.’s head being struck against an object twice or more.  Dr. Konzelmann did not see any distinct skin injuries on the side or the back of B.C.’s head.  Dr. Konzelmann also testified that B.C. had significant brain swelling and a left side subdural hemorrhage or hematoma between the skull and brain. 

Dr. Konzelmann testified that skull fractures are harder to cause in a child than in an adult because a child’s skull is growing and more flexible; thus, a child can sustain impacts from proportionately greater forces without suffering a fracture or life-threatening injury.  According to Dr. Konzelmann, “significant force” caused B.C.’s injuries.  Dr. Konzelmann testified that B.C.’s injuries were similar to injuries sustained by children who had been in a serious collision and ejected from a car or who had been run over by a car and struck in the head.  Dr. Konzelmann stated that B.C.’s injuries could not have occurred by falling or diving off of any part of the couch. 

When asked what kind of fall could have caused B.C.’s injuries, Dr. Konzelmann stated that it depended on several variables, that a fall from multiple stories could have caused the injuries, but that in this case he would expect only a single impact to occur from a single fall.  He said that it would be possible in an unusual circumstance for one fall to cause two distinct impacts, such as a fall onto “two distinct raised areas that aren’t sharp” but that he would expect that a single fall would lead to a single skull impact.

Dr. Konzelmann opined that the cause of B.C.’s death was “[b]lunt force head injury,” which he agreed was consistent with being struck by or against a “blunt force object.”  Dr. Konzelmann explained the lack of external injuries on B.C., testifying that in ten to fifty percent of infants with severe injuries, no external injuries are visible.  Dr. Konzelmann could not say what exactly B.C. had been struck with or against, but he agreed it could have been a wall, floor, concrete patio, or something “heavy and flat.”  Dr. Konzelmann also agreed that whatever it was, it was a deadly weapon. 

On cross-examination, appellant asked Dr. Konzelmann whether B.C. could have been pushed down on the couch and then catapulted off onto the floor and hit his head.  Dr. Konzelmann responded that that “could have happened in this case.”  Although Dr. Konzelmann testified that he believed the skull fractures occurred around the same time, he admitted that they could have occurred up to twelve hours apart. 

On redirect examination, however, Dr. Konzelmann testified that the fractures, which appeared fresh, and the subdural hematoma and galeal bruising, all appeared to have occurred around the same time.  He also testified that B.C.’s injuries could not have come from a fall because if a child sustains a fracture as a result of a fall of ten feet or less, the child typically sustains only a short linear fracture, not a complex, branching fracture.  Dr. Konzelmann also rejected the theory that B.C. had sustained the injuries by being “spiked” or pushed onto the couch and then hitting his head after bouncing off.  According to Dr. Konzelmann, “the fracture type is wrong, fracture size is wrong[,] and there are two fractures.”  Dr. Konzelmann stated that although he had agreed with appellant’s counsel that certain other scenarios could have happened—such as B.C. bouncing off the couch and hitting his head—those scenarios were in addition to whatever caused B.C.’s complex, branching fractures.  He agreed that it is much more believable that B.C. was picked up by his legs or waist and swung into a blunt, flat object or that something was accelerated into his head.  He also reiterated that adults are much more likely to sustain a head injury in a fall than children.  Dr. Konzelmann further stated that it was not important to his findings whether B.C. was shaken or not.  

Detective Dennis Hutchins testified that he took appellant’s statement after B.C. had been taken to the hospital.  The pertinent parts of appellant’s statement are as follows:

[B.C.] and I went to the living room and were watching television [after Jessica went to work].  I left the front door open so that [B.C.] could play on the front porch.  At about 4:45 or 5:00 p.m., I heard [B.C.] crying on the front porch.  I went to check on him to make sure he was okay, and he was lying on his back crying.  I didn’t see any injuries so I picked him up and took him back inside.  For about five or ten minutes, I tried everying that I could think of to get [B.C.] to stop crying but nothing was working.  I tried holding him; I tried giving him his cup and toys but he still continued to cry.

  

I was holding him facing me with my thumbs on [B.C.’s] chest and my hands wrapped around his back.  I shook [B.C.] about three or four times trying to get him to stop crying.  I sat [B.C.] on the couch and he passed out.  I shook [B.C.] again in order to wake him up.  The second time I shook him was not hard enough to hurt him.

Before Detective Hutchins took appellant’s statement, he had an affidavit from Dr. Michael Cowan who had examined B.C. at the hospital.  From Dr. Cowan’s affidavit, Detective Hutchins learned that B.C.’s left pupil was abnormally dilated, indicating a severe head injury, that B.C.’s retina was bleeding, that B.C. had suffered a subdural hematoma, and that B.C. had skull fractures and infarctions to the brain.  Dr. Cowan’s affidavit was read into evidence:

Patient is an 18-month-old white male who presented by MedStar and was unresponsive upon arrival.  According to paramedics who brought the patient to the hospital, he fell off the couch about 2 feet from the ground.  The history of how the patient was injured was given to the paramedics by, quote, Michael. . . .  Michael, end quote, was taking care of the patient at the time of the injury. . . .

. . . .

. . . The patient’s extensive head injuries are inconsistent with the patient’s history of falling such a short distance.  In other words, the patient’s injuries are consistent with a significant impact or high energy force to the head to cause such an injury.

. . . The findings on the head CT are consistent with that found [on] a patient that received a significant, quote, blow or, quote, force to the head. 

Therefore, the history, as I know it at the present time, the patient falling off the couch, is wholly inconsistent with the patient’s injuries.  Based on my history and physical examination and the results of the head CT, this patient is a victim of an intentional injury, e.g., child, physical abuse.

Brenda C., Jessica’s mother, described the area outside Apartment 126, which she shared with Jessica, appellant, and B.C.  Just outside the apartment was a concrete patio enclosed by a wooden fence with a gate.  According to Brenda, B.C. was not tall enough to open the gate.  Outside of the fence is a concrete sidewalk and above it a cement wall about six feet tall.  The parking area for the apartments is above the wall.  It is accessed by taking the sidewalk to a point where the wall tapers down and two steps lead up into the parking area.  The wall had a metal rail with bars about a foot and a half apart. 

Dr. Konzelmann was called to testify again for the defense.  When asked if there was a height he would have expected B.C. to have fallen from to cause the fractures, Dr. Konzelmann stated that he could explain the presence of one fracture that way, but “two fractures is a lot more difficult.”  He agreed that studies have shown that a fall from three stories, or roughly thirty to thirty-six feet, could cause a skull fracture, but Dr. Konzelmann did not know “what the fractures looked like” in the studies.  Dr. Konzelmann testified again that he did not think B.C.’s injuries occurred from a free fall and that if B.C. had simply hit his head after falling from a significant height, he would expect to see only one linear fracture rather than two complex, branching fractures.  He did agree that “under very specialized circumstances, one blow can cause two fractures.”  Dr. Konzelmann also reiterated that although he made some findings that overlap with “the classic description of a shaken infant,” B.C.’s injuries were not consistent with a shaken baby and that was not his diagnosis of cause of death because of the “[t]otal lack of hemorrhaging in the neck muscles as well as evidence of the significant impact.” 

On cross-examination, Dr. Konzelmann elaborated on his belief that B.C. did not sustain his injuries by falling, even from a significant height.  He agreed that if B.C. had fallen off a six foot wall, he probably would not have suffered a skull fracture.  He also testified that when children fall eight or ten feet, fewer than one to two percent sustain any kind of skull fracture, and if they do, the fracture is a simple, nonbranched linear fracture.  Additionally, the fracture would not be as long as seven inches and would be closer to an inch or an inch and three quarters.  Dr. Konzelmann also testified that if B.C. had fallen onto exposed concrete, i.e., a sidewalk, he would expect to see an abrasion on B.C.’s skin because concrete is rough.  He did not see an abrasion on B.C.’s skin.  

Based on the record evidence and applying the appropriate standards of review, we hold that the evidence is both legally and factually sufficient to support the jury’s deadly weapon finding.  In a case such as this, in which a child is injured while in the care of one person and there are no witnesses as to what occurred to cause the child’s injury, the primary evidence of the manner of use of an object causing injury or death is evidence about the severity, scope, and nature of the child’s injuries.  
See Stanul
, 870 S.W.2d at 330-31, 335; 
Roark v. State
, No. 05-00-00584-CR, 2001 WL 1173916, at *6 (Tex. App.—Dallas Oct. 5, 2001, pet. ref’d) (not designated for publication); 
Kanagas v. State
, No. 14-98-00419-CR, 2000 WL 257767, at *3 (Tex. App.—Houston [14th Dist.] Mar. 9, 2000, pet. ref’d) (not designated for publication); 
Robey v. State
, No. 14-91-01029-CR, 1993 WL 282790, at *11 (Tex. App.—Houston [14th Dist.] July 29, 1993, pet. ref’d) (not designated for publication).

Here, two doctors opined that B.C.’s injuries were consistent with being struck rather than falling.  Dr. Konzelmann never wavered from his conclusion that B.C.’s injuries could only have occurred from being struck with or against a heavy, flat object rather than falling, even from a significant height.  Dr. Konzelmann’s findings were very specific:  although he did agree that some of the defense’s proposed scenarios could have occurred, he also unequivocally stated that those scenarios would not have produced the injuries that caused B.C.’s death.  Dr. Konzelmann’s conclusions were based on studies, which he provided to the defense.  Appellant did not present any evidence contrary to Dr. Konzelmann’s testimony.  Factually, this case is substantially similar to those cases cited above in which medical testimony regarding the nature, severity, and scope of injury supports a jury’s deadly weapon finding.  We overrule appellant’s first and second points.

Having overruled both of appellant’s points, we affirm the trial court’s judgment.

TERRIE LIVINGSTON

JUSTICE

PANEL B: LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

PUBLISH

DELIVERED:  September 8, 2005

FOOTNOTES
1:
This offense was included in the court’s charge at appellant’s request. 

2:
Appellant also contends that the mens rea for the offense, negligence, is inconsistent with a deadly weapon finding, which requires evidence of intent.  But an object is not a deadly weapon because the actor intends to cause the result, i.e., death or serious bodily injury; “intent” in the context of a deadly weapon refers to the actor’s intended use of the object.  
See Dotson
, 146 S.W.3d at 299.  An object is a deadly weapon if “the actor intends a use of the object in which it would be capable of causing death or serious bodily injury.”  
Id
.