**AFFIRM; and Opinion Filed December 13, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-00814-CR

### MIGUEL E. GARCIA-ARRENDONDO, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the 297th District Court**
**Tarrant County, Texas**
**Trial Court Cause No. 1468097R**

## MEMORANDUM OPINION

Before Justices Bridges, Francis, and Lang-Miers
Opinion by Justice Lang-Miers

A jury found appellant Miguel E. Garcia-Arrendondo[1] guilty of aggravated assault of a family member with a deadly weapon and assessed punishment at 30 years' imprisonment. In five issues, appellant challenges the sufficiency of the evidence to support the jury's finding of guilt, contends that the indictment and the jury charge were impermissibly vague, and argues that there was error in the jury charge in the punishment phase of the trial. We affirm the trial court's judgment.

---

[1] Appellant's surname appears in the record in several different forms, including "Garciaarrendondo," "Garcia Arrendondo" with and without a hyphen, and "Garcia." The record reflects that "Arrendondo" is appellant's mother's maiden name, and according to custom, is often included after his father's surname, "Garcia." Our use of the hyphenated spelling is intended to include all of these versions.

## BACKGROUND

J.C., eight months old, suffered a massive head injury on April 6, 2014. At the time of his injury, J.C. resided in his grandfather's apartment with six others: (1) his mother, Jessica Acosta, (2) appellant, Jessica's then-boyfriend, (3) his grandfather Ruben Acosta, (4) his grandfather's girlfriend Esperanza "Hope" Gomez, (5) his aunt Destiny Acosta, and (6) Jessica's son J.A., then four or five years old. All six were home the evening baby J.C. was injured. All but appellant and J.A. testified at trial, although the jury heard an audiotape and watched a videotape of appellant's interviews with an Arlington police detective.

The evidence of J.C.'s injuries was undisputed. He suffered a "cranial burst fracture," according to David Donahue, M.D., a pediatric neurosurgeon at Cook Children's Medical Center in Fort Worth who has treated J.C. since the night of his injury. J.C.'s face and head were swollen when Dr. Donahue first saw him in the emergency room, and he "had a lot of significant features" of hemorrhagic shock, a life-threatening condition. A CT scan revealed the cranial burst fracture. Dr. Donahue explained that a cranial burst fracture is "not your usual skull fracture." It "requires great force" to create.

Slides from the CT scan and an MRI were shown to the jury. J.C. had fractures "on both sides of the skull" that were "very recent." Dr. Donahue testified that "either he had a very spectacular blow to the head that was enough to cause both" fractures, "or he was injured twice." There was also an "offshoot fracture from the main fracture," "[j]ust indicating again that there is a lot of—a lot of force applied." The larger fracture was a "diastatic" or wide fracture. In the patients Dr. Donahue has reported with diastatic fractures, "every one of them who had this injury, all of those injuries have been the result of terrific force. All of those children had diastatic fractures like this. That's a fracture that's more than five millimeters wide." One of the patients suffered a diastatic fracture after falling from a second-story window; several others had been physically assaulted.

Dr. Donahue also identified pictures of J.C. in the hospital on the night of his injury. Brain tissue had herniated into the space between the bone and the scalp. Under the scalp was "absolute pandemonium." There was a blood clot, "[a]nd then there is this area of brain tissue that's extravasated, or squirted out, from the inside of the skull." The dura, or the covering, of J.C.'s brain ruptured, and the brain was "lacerated to a distance of almost four centimeters."

Dr. Donahue described the injury as "a classic cranial burst fracture," explaining,

[T]he best way to understand it is if you took a grape and squeezed it between your fingers, and what happens when you squeeze hard enough, what—the inside—what's inside the grape comes out through the skin. Well, in the baby, it doesn't come out through the skin, it stays under the skin. But the material that's supposed to be inside the skull comes out from inside the skull because the skull has been violated or has been—has been fractured. And so, that—that is a cranial burst fracture because it's just like, in fact, the skull has burst.

. . . .

The thing to understand is that there is—there is a lot of force involved in whatever produces this type of injury. . . . [T]his doesn't happen when somebody falls off the couch, unless the couch was on top of the Empire State Building; otherwise, it's not going to happen for those types of injuries.

Q. What about a baby rolling around in the crib and hitting its head on the side of the crib?

A. I would think that would be almost impossible.

Dr. Donahue explained that once the brain tissue has leaked out of the skull, "you try to save as much as you can," but most must be discarded. "Nearly half" of the left side of J.C.'s brain is gone as a result of his injury, shown on the scans as "a huge black hole."

Dr. Donahue explained that in his experience, in a child with a cranial burst fracture "the reaction is immediate loss of consciousness and alteration of mental status."

Dr. Donahue testified that although J.C. survived, he has "significant deficits, neurological deficits." The "whole brain is affected" by the injury. J.C. can walk, although he is partially paralyzed on one side, and he is "missing a good part of his skull." He can talk and interact with people, but "we don't know what his cognitive status will be" when he reaches school age. He has

–3–

a higher risk of learning disabilities. He has hydrocephalus, "a condition that occurs in children who have had intercranial hemorrhage," so that his brain is "unable to process" spinal fluid properly. For the rest of his life, J.C. requires a shunt in his brain to drain the fluid. He wears a helmet for protection, because part of his skull is missing. Dr. Donahue explained:

> [W]e did put the bone fragments back in, but the bone fragments just melted away. And that happens in about five to ten percent of patients. We don't know why that happens. . . . So when he gets older, we'll have to put in some kind of a plate, so he'll have to have another operation. And when we do that, there is a ten percent chance it will cause him to have seizures. He's already had seizures, as you would imagine. But we could reactivate those seizures when we have to reoperate and put this plate in. Of course, we know he's going to want to have a plate so he can go out and run into things like kids like to do. So we still have a lot of work to do. And this hydrocephalus problem with the fluid, we haven't—we haven't gotten that totally corrected either . . . . So—so—we still have a lot of work to do for [J.C.].

He testified that "[a]t least two" more surgeries would be required.

At trial, the State offered evidence that appellant was alone with J.C. in one of the apartment's two bedrooms immediately before J.C.'s injuries were discovered. Appellant himself confirmed this in his interviews with Detective Mary Marguerite Almy of the Arlington Police Department. He and each of the other witnesses explained that after the family had dinner together, Ruben, Hope, and J.A. went to Ruben's bedroom, appellant and J.C. went to the second bedroom where appellant, Jessica, and J.C. lived, and Jessica and Destiny were cleaning up in the kitchen.

All of the witnesses testified that before and during dinner, J.C. looked and acted as he normally did. He had returned home from a visit with his father, was fed some dinner and a cookie, and sat on Ruben's or Destiny's lap while appellant and Jessica went outside to smoke. Jessica, appellant, and J.C. then went to the second bedroom. Jessica placed J.C. in his crib before going back to the kitchen to do the dishes with Destiny. Appellant remained in the bedroom with J.C., listening to music on his headphones and doing a word search puzzle on the bed. J.C. remained in his crib during Jessica's absence. Appellant left the bedroom at one point to tell Jessica that J.C. was crying. Appellant then returned to the bedroom. When Jessica returned to the bedroom, she

–4–

and appellant remarked that the room was hot, and discussed changing J.C.'s clothes and diaper. Jessica asked appellant to pick up J.C., which he did. Appellant immediately noticed that J.C.'s head was swollen and that J.C. was not responsive.

Appellant left the room to notify the others, and Hope called 911. But because there was a hospital close by, the family decided that driving J.C. to the hospital themselves would be faster than waiting for an ambulance. Appellant drove J.C., with Jessica and Destiny, to Texas General Hospital. Later, J.C. was transferred to Cook Children's Medical Center, where he was treated by Dr. Donahue and others.

There were factual discrepancies among the witnesses' testimony, and factual discrepancies between appellant's recorded interviews and the witnesses' testimony at trial. And there was evidence that Jessica (1) gave inconsistent explanations of the events of the evening, including the time that elapsed while she was out of the bedroom, (2) initially told emergency room personnel that J.C. had a fever and congestion, not that he was nonresponsive with a swollen face and head, (3) maintained appellant's innocence throughout the investigation of the case, and (4) may have received more favorable treatment on drug charges for her cooperation with the State. Jessica was in custody at the time of trial, in a "rehab prison" receiving drug treatment. At trial, the defense sought to establish that "Team Jessica"—her family members living in the apartment at the time of the offense—conspired to incriminate appellant to protect Jessica from the consequences of her actions.

Appellant was charged with one count of injury to a child and one count of aggravated assault of a family member with a deadly weapon, "namely a hard or soft object or surface, during the commission of this assault." The indictment also included a deadly weapon finding notice related to count one, injury to a child. Appellant pleaded not guilty to both counts, and not true to the deadly weapon finding notice related to count one.

The jury charge contained a definition of "deadly weapon," and instructed the jury on the elements of the two offenses submitted for the jury's determination, injury to a child and aggravated assault of a family member. The jury found appellant not guilty on count one, injury to a child, but guilty on count two, aggravated assault of a family member with a deadly weapon, and sentenced appellant to 30 years' confinement. This appeal followed.

## DISCUSSION

Appellant was convicted of aggravated assault as charged in count two of the indictment. Count two provided:

> COUNT TWO: AND IT IS FURTHER PRESENTED IN AND TO SAID COURT THAT THE DEFENDANT IN THE COUNTY OF TARRANT AND STATE AFORESAID ON OR ABOUT THE 6TH DAY OF APRIL 2014, DID INTENTIONALLY OR KNOWINGLY OR RECKLESSLY CAUSE SERIOUS BODILY INJURY TO [J.C.], A MEMBER OF THE DEFENDANT'S FAMILY OR HOUSEHOLD, BY STRIKING [J.C.] WITH OR AGAINST A HARD OR SOFT OBJECT OR SURFACE, AND THE DEFENDANT DID USE OR EXHIBIT A DEADLY WEAPON, NAMELY A HARD OR SOFT OBJECT OR SURFACE, DURING THE COMMISSION OF THIS ASSAULT,

A person commits the offense of aggravated assault if the person commits assault as defined in penal code section 22.01[2] and the person causes serious bodily injury[3] to another or uses or exhibits a deadly weapon during the commission of the assault. TEX. PENAL CODE ANN. § 22.02(a) (aggravated assault). The offense is a felony of the second degree, except that the offense is a felony of the first degree if the actor uses a deadly weapon during the commission of the assault and causes serious bodily injury to a person living in the same household. TEX. PENAL CODE ANN. § 22.02(b)(1); TEX. FAM. CODE ANN. § 71.005 (defining "household"); *see also Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016) (discussing elements of first-degree aggravated

---

[2] In relevant part, section 22.01 provides that "a person commits an offense if the person . . . intentionally, knowingly, or recklessly causes bodily injury to another." *See* TEX. PENAL CODE ANN. § 22.01(a)(1).

[3] "Serious bodily injury" is defined in section 1.07(a)(46) of the penal code as "bodily injury that creates a substantial risk of death or that causes . . . serious permanent disfigurement, or protracted loss or impartment of the function of any bodily member or organ." TEX. PENAL CODE ANN. § 1.07(a)(46). Appellant does not contend that J.C.'s injuries do not meet this definition.

assault of family member). As relevant here, "deadly weapon" means "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." TEX. PENAL CODE ANN. § 1.07(a)(17)(B). "[A]lmost anything can be a deadly weapon 'depending upon the evidence shown.'" *Lane v. State*, 151 S.W.3d 188, 191 n.5 (Tex. Crim. App. 2004) (quoting *Turner v. State*, 664 S.W.2d 86, 90 (Tex. Crim. App. 1983)).

The punishment range for a second degree felony is imprisonment for a term of "not more than 20 years or less than 2 years." TEX. PENAL CODE ANN. § 12.33(a). The punishment range for a first degree felony is imprisonment "for life or for any term of not more than 99 years or less than 5 years." TEX. PENAL CODE ANN. § 12.32(a).

Appellant presents five issues on appeal. We discuss the applicable standards of review in our consideration of each issue.

**1. Sufficiency of the evidence**

In his first issue, appellant argues that the evidence is insufficient to support his conviction because there is no exact determination of the time J.C. was injured. He contends the evidence showed that all of the adults in the apartment admitted contact with J.C. during the period of time during which Dr. Donahue testified the injury probably occurred; there was evidence that at least one other person was alone with J.C.; and no one admitted seeing the injury occur. He concludes that given the state of the record, the jury was required to speculate in order to reach a verdict.

When addressing a challenge to the sufficiency of the evidence, we consider whether, after viewing all of the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (review of "all of the evidence" includes evidence that was properly and improperly admitted). "Appellate review 'does

not intrude on the jury's role to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Johnson v. State*, No. PD-0197-17, 2018 WL 5810857, at \*1 (Tex. Crim. App. Nov. 7, 2018) (quoting *Musacchio v. United States*, 136 S.Ct. 709, 715 (2016)); *accord Zuniga*, 551 S.W.3d at 732; *see also Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007) ("inference" is conclusion reached by considering other facts and deducing legal consequence from them). "We may not re-weigh the evidence or substitute our judgment for that of the fact-finder." *Zuniga*, 551 S.W.3d at 732.

Although juries may not speculate about the meaning of facts or evidence, juries are permitted to draw any reasonable inferences from the facts as long as each inference is supported by the evidence presented at trial. *Id.* at 733. We presume that the factfinder resolved any conflicting inferences from the evidence in favor of the verdict, and we defer to that resolution. *Id.*; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). In analyzing the sufficiency of the evidence, we determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Clayton*, 235 S.W.3d at 778. Further, "[d]irect evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Zuniga*, 551 S.W.3d at 733.

Appellant relies on Destiny's testimony that she was alone with J.C. when appellant and Jessica took a smoke break on the porch, before Destiny and Jessica cleaned the kitchen. He also relies on Dr. Donahue's testimony that J.C.'s injuries most likely occurred within 12 hours before Dr. Donahue saw J.C. at the hospital, a time frame during which many others had access to J.C., and Dr. Donahue's inability to pinpoint a more exact time of injury. Appellant also argues that Dr. Donahue admitted J.C. could have cried or moved even when unconscious. He points out that no

witness admitted seeing the injury occur. He argues that based on this evidence, it is equally likely that Destiny caused the injury, and the jury was required to speculate to reach its verdict. We disagree.

The jury heard appellant's own version of the events of the evening in his audiotaped and videotaped interviews played at trial. His version did not contradict, and for the most part was the same as, the accounts of the other witnesses at trial. Baby J.C. was fine when he returned home from his father's around 6:00 p.m., through dinner, during Jessica's and appellant's smoke break, and when Jessica took him to his crib in her bedroom at approximately 8:00 p.m. After that time, J.C. was alone with appellant in the bedroom until Jessica returned at approximately 9:00 p.m. When Jessica returned, she and appellant discovered that J.C. had been severely injured.

No witness testified to seeing appellant harm J.C. In his interviews, appellant denied harming J.C. or even picking him up from the crib. But in cases of injury to a child, "there is rarely direct evidence of exactly how the child's injuries occurred." *Williams v. State*, 294 S.W.3d 674, 683 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). Here, the jury could have relied on Dr. Donahue's testimony about the type and severity of J.C.'s injuries, including his testimony that diastatic fractures like J.C.'s were "the result of terrific force" and would have caused almost immediate unconsciousness, and the undisputed evidence that appellant was alone with J.C. immediately before J.C.'s injuries were discovered, to support its finding that appellant was guilty of aggravated assault. *See id.* at 681 (testimony of medical examiner that brain injuries child sustained were not from a simple fall but were of a type sustained when child is shaken very hard and then thrown into an object or wall at high speed supported finding of appellant's intentional conduct).

Although the evidence is circumstantial, when viewed in the light most favorable to the jury's verdict, "the cumulative force of all the incriminating circumstances is sufficient to support

the conviction." *See Zuniga*, 551 S.W.3d at 733. After viewing all of the evidence in the light most favorable to the verdict, we conclude the jury could have found the essential elements of aggravated assault beyond a reasonable doubt. *See id.* We decide appellant's first issue against him.

**2. Evidence of deadly weapon**

In his second issue, appellant contends the trial court erred by denying his motion for directed verdict because there was insufficient evidence of a deadly weapon used in the offense. He argues that Dr. Donahue gave several possibilities of how J.C.'s injuries occurred, but "could not say exactly what caused the injury."[4] As quoted above, the indictment alleged that appellant "cause[d] serious bodily injury to [J.C.] . . . by striking [J.C.] with or against a hard or soft object or surface, and the defendant did use or exhibit a deadly weapon, namely a hard or soft object or surface, during the commission of this assault."

In criminal cases, a challenge to the denial of a motion for directed verdict is treated as a challenge to the legal sufficiency of the evidence and is reviewed under the standard applicable to a legal sufficiency challenge. *Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996). Consequently, as we have explained, we consider whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, after viewing all of the evidence in the light most favorable to the verdict. *Zuniga*, 551 S.W.3d at 732. Specific to appellant's complaint, we consider whether any rational trier of fact could have found beyond a reasonable doubt that appellant used a deadly weapon in the commission of the offense, after viewing all of the evidence in the light most favorable to the verdict.

---

[4] In addition, appellant argues the jury's answer to the deadly weapon question on the verdict form reflected a finding that no deadly weapon was used in the offense. We discuss the verdict form in considering appellant's fourth issue below, and for the reasons explained there, we decide that portion of appellant's second issue against him.

–10–

A fact finder may affirmatively find that a deadly weapon was used even if the object is not identified. *Gordon v. State*, 173 S.W.3d 870, 873 (Tex. App.—Fort Worth 2005, no pet.). The presence and severity of wounds on the injured party are factors to be considered in determining whether an object was used as a deadly weapon. *Id.* When there are no witnesses to what occurred to cause a child's injury, the primary evidence of the manner of use of an object causing injury is evidence about the severity, scope, and nature of the child's injuries. *Id.* at 877.

As we have discussed, Dr. Donahue gave detailed testimony about the severity, scope, and nature of J.C.'s injuries. *See id.* He also testified to possible causes of the injuries. Dr. Donahue testified that J.C.'s injuries could not have been caused by a fall from a couch or hitting his head on the side of his crib. He testified that in his opinion, the injury was inflicted, not accidental, because it was unexplained. In his experience, "the nature of the injuries themselves" indicated "nonaccidental trauma." According to Dr. Donahue, cranium burst fractures are not spontaneous. "[A]pplication of force, by any means, is enough to do this." He testified that either a hard object or a soft object could have been used:

> A. . . . If you consider a hand soft objects, you can squeeze a child's head hard enough to fracture their head like this.
>
> Q. Okay.
>
> A. So I don't know what—we are using "hard" and "soft." So that's—that's a tough one for me. But I think there was some sort of compression to cause the skull fracture, and that's a fact. And whether you—whether you want to say that the child is between two pillows and somebody steps on him or whether somebody's hand squeezed them, is that hard or soft? I don't know. I guess you could call it hard.
>
> Q. Sure.
>
> A. And a soft object, you can have terrible intercranial injuries with soft objects, but I wouldn't expect to see a fracture.
>
> Q. Okay.
>
> A. But a hand—if you are calling a hand—we're getting back into mechanism again—and I'm not qualified to comment on that. I can only say you can squeeze—get mad enough at a baby and squeeze their head and pop their head like this baby's

–11–

was popped. Or you can—you can grab them by the feet and hit them against the wall and burst their head that way. So one—one—one case, it's a hard object; one case, it's a soft object.

Q. Right. The bottom line being, you have no ability to say what object it is in this case?

A. I do not, no sir.

. . .

Q. Okay. So this injury would be consistent with being stomped?

A. Yes.

Q. Okay. Would it be consistent with having a head bashed into a wall?

A. Yes.

Q. A countertop?

A. Sure.

. . .

Q. Is it possible that even an object like a doorjamb could be used to cause this kind of a contact?

A. I—I don't know. It depends on how his head hits the door—the doorjamb, but it's possible, yes, absolutely.

The trier of fact can make an affirmative finding of a deadly weapon even when the weapon used is an "unknown object." *Mixon v. State*, 781 S.W.2d 345, 346 (Tex. App.—Houston [14th Dist.] 1989), *aff'd*, 804 S.W.2d 107 (Tex. Crim. App. 1991) (per curiam). The jury may consider all the facts of a case when determining whether a weapon is "deadly." *See Blain v. State*, 647 S.W.2d 293, 294 (Tex. Crim. App. 1983). After considering all of the evidence in the light most favorable to the jury's verdict, we conclude that a rational trier of fact could have found from the evidence beyond a reasonable doubt that appellant "cause[d] serious bodily injury to [J.C.] . . . by striking [J.C.] with or against a hard or soft object or surface, and the defendant did use or exhibit a deadly weapon, namely a hard or soft object or surface, during the commission of this assault." *See Zuniga*, 551 S.W.3d at 732. We decide appellant's second issue against him.

–12–

**3. Sufficiency of indictment**

In his third issue, appellant argues the indictment gave him insufficient notice because its description of the means of injury, a "hard or soft object or surface," failed to describe the specific manner and means of commission of the assault. He contends he could not defend against both "hard" and "soft" objects or surfaces because they are opposites, and complains that both the indictment and the State's pleading are too vague. The sufficiency of an indictment is a question of law. *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004). When the resolution of a question of law does not turn on an evaluation of the credibility and demeanor of a witness, an appellate court conducts a de novo review of the issue. *Id.*

The State responds that appellant failed to preserve his objection to the indictment. *See Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002) (to preserve error for appellate review, complaining party must make specific objection and obtain ruling). At a pretrial hearing, appellant's counsel argued that the deadly weapon description in the indictment was "both vague and impossible in its definition . . . to even be a deadly weapon." He added, "we'll have better objections for you later." He continued, "by definition, the opposite of hard is soft and the opposite of soft is hard; that's about as vague as you can get." The trial court responded that it was ambiguous rather than vague, and asked for case law on the subject. Neither party offered any. The trial court then asked defense counsel what he was "asking the Court to do." Counsel responded, "[s]trike the deadly weapon notice for its vague [sic] and ambiguity." The court responded, "I will not do that at this time, but I'll take it under consideration."

Appellant did not make any further objection or file a motion to quash the indictment, and the trial court did not make any further ruling. Nor did appellant argue in the trial court that the indictment failed to give him sufficient notice in order to prepare his defense, as he argues on appeal. *See Yazdchi v. State*, 428 S.W.3d 831, 844 (Tex. Crim. App. 2014) (point of error raised

on appeal must comport with objection made at trial). But assuming this objection and ruling were sufficient to preserve error, we conclude the indictment was not impermissibly vague.

An indictment "must be specific enough to inform the accused of the nature of the accusation against him so that he may prepare a defense." *Moff*, 154 S.W.3d at 601; *see also* TEX. CODE CRIM. PROC. ANN. art. 21.11 (indictment sufficient "with that degree of certainty that will give the defendant notice of the particular offense with which he is charged"). "A motion to quash should be granted only where the language concerning the defendant's conduct is so vague or indefinite as to deny the defendant effective notice of the acts he allegedly committed." *State v. Siebert*, 156 S.W.3d 32, 35 (Tex. App.—Dallas 2004, no pet.). Ordinarily, an indictment is legally sufficient if it delineates the penal statute in question. *Moff*, 154 S.W.3d at 602. As quoted above, the indictment tracks the language of penal code section 22.02. *See also Siebert*, 156 S.W.3d at 37 ("A charging instrument which tracks the language of a criminal statute possesses sufficient specificity to provide a defendant with notice of a charged offense, and the State need not allege facts which are merely evidentiary in nature."). In an aggravated assault case, notice is sufficient if the indictment alleges that some object or instrument caused serious bodily injury to the complainant. *See Arreola v. State*, No. 05-13-00181-CR, 2014 WL 7014187, at *6 (Tex. App.— Dallas Dec. 5, 2014, pet. ref'd) (not designated for publication); TEX. PENAL CODE ANN. § 1.07(a)(17)(B) (defining "deadly weapon" as "anything that in the manner of its use or intended use is capable of causing death or serious injury"). The State's inability to identify one or more of the deadly weapons alleged did not render its notice to appellant inadequate. *Arreola*, 2014 WL 7014187, at *6.

But appellant argues that under *State v. Barbernell*, 257 S.W.3d 248, 255 (Tex. Crim. App. 2008), we must "engage in a two-step analysis." First, we must "identify the elements of the offense," including "the forbidden conduct, the required culpability, if any, any required result,

and the negation of any exception to the offense." *Id.* Next, "when the Legislature has defined an element of the offense that describes an act or omission, a court must ask whether the definitions provide alternative manners or means in which the act or omission can be committed." *Id.* "If this second inquiry is answered in the affirmative, a charging instrument will supply adequate notice only if, in addition to setting out the elements of an offense, it also alleges the specific manner and means of commission that the State intends to rely on at trial." *Id.* Appellant contends that "the phrase 'hard or soft object or surface' fails to describe the specific manner and means of commission." *Barbernell*, however, did not involve the description of a deadly weapon. *Cf. id.* at 254–56 (applying two-step analysis to term "intoxicated" used in charging instrument). Appellant does not cite a case applying *Barbernell* to an allegation of an unknown deadly weapon in an indictment, and we have found none. *Cf. Boney v. State*, 572 S.W.2d 529, 532 (Tex. Crim. App. 1978) ("An indictment for aggravated assault need not allege the manner and means used to commit the assault as such is not an element of the offense but relates only to the certainty and definiteness required to enable the defendant to reasonably understand the nature and cause of the accusation against him.").

Additionally, an unknown object may be a deadly weapon. *Mixon*, 781 S.W.2d at 346.[5] In *Blount v. State*, 257 S.W.3d 712, 714 (Tex. Crim. App. 2008), the court held that "an allegation that a defendant committed aggravated assault gives him notice that the deadly nature of the weapon alleged in the indictment would be an issue at trial and that the State may seek an affirmative finding on the use of the weapon." The court explained:

> Aggravated assault may be committed in only two ways: (1) by "caus[ing] serious bodily injury," or (2) by "us[ing] or exhibit[ing] a deadly weapon during the commission of the assault." Each of these involves the use of a deadly weapon. The first way necessarily implies the use of a deadly weapon, which is "anything that in

---

[5] In its opinion affirming the court of appeals' judgment in *Mixon*, the Court of Criminal Appeals stated that "[w]e have reviewed that part of the court of appeals' opinion dealing with the merits of an affirmative finding of an unknown object as a deadly weapon and the evidence in support thereof. We find the reasoning of the court of appeals is sound. We therefore adopt that part of the opinion as our own, without further comment." *Mixon*, 804 S.W.2d at 108 (footnote omitted).

–15–

the manner of its use or intended use is capable of causing death or serious bodily injury." The second way specifies the use of a deadly weapon.

*Id.* (footnotes omitted). Consequently, the court concluded the appellant was given adequate notice that there would be an issue of his use or exhibition of a deadly weapon in the commission of the offense of burglary of a habitation in which he committed or attempted to commit aggravated assault. *Id.* at 713, 714–15. "It is well settled law that an allegation of serious bodily injury or death caused by some act or instrument is sufficient notice for a deadly weapon finding." *Dotson v. State*, 146 S.W.3d 285, 300 (Tex. App.—Fort Worth 2004, pet. ref'd).

Here, the indictment alleged that appellant committed the act of "striking" J.C. "with or against a hard of soft object or surface," using a deadly weapon, "namely a hard or soft object or surface, during the commission of this assault." We conclude appellant had sufficient notice of "the nature of the accusation against him so that he may prepare a defense," *Moff*, 154 S.W.3d at 601, and sufficient notice that the State intended to pursue a deadly weapon finding. *See Arreola*, 2014 WL 7014187, at *6. We decide appellant's third issue against him.

**4. Ambiguity of verdict form**

In his fourth issue, appellant argues that the "ambiguous and confusing verdict form" caused him egregious harm. As completed by the jury, the verdict forms provided:

### VERDICT FORMS

### COUNT ONE

We, the Jury, find the defendant, Miguel E. Garciaarrendondo, guilty of the offense of injury to a child as charged in count one [of] the indictment.

      _____
      FOREMAN

### -OR-

We, the Jury, find the defendant, Miguel E. Garciaarrendondo, not guilty.

      [signature of jury foreman]
      FOREMAN

–16–

## COUNT TWO

We, the Jury, find the defendant, Miguel E. Garciaarrendondo, guilty of the offense of aggravated assault as charged in count two [of] the indictment.

[signature of jury foreman]
FOREMAN

### -OR-

We, the Jury, find the defendant, Miguel E. Garciaarrendondo, not guilty.

_____
FOREMAN

There was an instruction and a special issue on the next page of the charge:

If you find the defendant, Miguel E. Garciaarrendondo, guilty of the offense of injury to a child as charged in count one, then you should also consider the following special issue. Otherwise, do not consider the special issue.

### SPECIAL ISSUE

Do you find from the evidence beyond a reasonable doubt that a deadly weapon, namely: a hard or soft object or surface, that in the manner of its use or intended use was capable of causing death or serious bodily injury, was used or exhibited during the commission of the felony offense or felony offenses set out above and that the defendant used or exhibited the deadly weapon?

ANSWER:     _____We do          ____✓____We do not

Appellant argues that the jury's answer "we do not" in response to the question whether appellant used a deadly weapon in the commission of the offense indicates the jury's agreement that there was no evidence of a deadly weapon. He concludes that the trial court should have rejected the verdict because it "contradicted itself and was clearly not answered as authorized." Appellant did not object to the charge as ambiguous, nor did he object on the ground that there was error related to the deadly weapon special issue. He did object after the jury reached its verdict of guilt.

We apply a two-step analysis in determining whether a jury charge was erroneous. *Cortez v. State*, 469 S.W.3d 593, 598 (Tex. Crim. App. 2015). First, we determine whether the charge contained error. *Id.* Second, if error is found, we must analyze whether the error caused harm. *Id.* If error was not preserved by objection, the appellant must show egregious harm to obtain reversal of the conviction. *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005).

We conclude there was no error in the jury charge. The trial court correctly instructed the jury on both counts, and correctly instructed the jury in the special issue. The trial court specifically instructed the jury not to consider the special issue unless it found appellant guilty of injury to a child. The error was made by the jury in answering the question when they had found appellant not guilty of injury to a child as charged in count one. But the jury's answer of "we do not" is consistent with its not guilty finding on count one.

> The charge contained the following instructions applicable to count two:
>
> A person commits the offense of aggravated assault if a person intentionally or knowingly or recklessly uses or exhibits a deadly weapon during the commission of the assault or if the person uses a deadly weapon during the commission of the assault and causes serious bodily injury to a member of his family or his household.
>
> . . .
>
> Now, if you find from the evidence beyond a reasonable doubt that on or about the 6th day of April 2014, in Tarrant County, Texas, the defendant, Miguel E. Garciaarrendondo, did intentionally or knowingly or recklessly cause serious bodily injury to [J.C.], a member of the defendant's family or household, by striking [J.C.] with or against a hard or soft object or surface and the defendant did use or exhibit a deadly weapon, namely a hard or soft object or surface, during the commission of this assault, then you will find the defendant guilty of the offense of aggravated assault, as charged in count two of the indictment.
>
> Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will find the defendant not guilty of aggravated assault as charged in count two of the indictment.

The charge contained definitions of "deadly weapon," "serious bodily injury," and the three mental states relevant to count two, among other definitions. The jury could not have found appellant "guilty of the offense [of] aggravated assault as charged in count two [of] the indictment" without

finding that appellant "did use or exhibit a deadly weapon, namely a hard or soft object or surface, during the commission of this assault."

Appellant also contends that the jury rendered an "informal verdict" because the verdict form was ambiguous. *See* TEX. CODE CRIM. PROC. ANN. art. 37.10(a).[6] Citing *Jennings v. State*, 302 S.W.3d 306, 309 (Tex. Crim. App. 2010), appellant argues that the verdict "does not meet the legal requirements of being . . . answered as authorized," and the trial court should have sent the jury back for further deliberation. But in *Jennings*, the court explained that the "governing rule concerning the submission of verdict forms" is that "a trial judge need not attach a verdict form to the jury charge, but if he does so, it must set out every 'guilty' or 'not guilty' option that is available to the jury." *Id.* at 310. "[I]t is 'improper' to submit a verdict form that omits any 'guilty' or 'not guilty' option that is available to the jury." *Id.* (citing *Oates v. State*, 103 S.W. 859, 862 (Tex. Crim. App. 1907), and *Williams v. State*, 7 S.W. 333, 336 (Tex. Ct. App. 1888)). Here, in contrast to *Jennings*, the trial court included all guilty and not guilty options that were available to the jury. *Cf. Jennings*, 302 S.W.3d at 308 (verdict form did not include "not guilty" option for lesser-included offense). And in any event, we review verdict form error under the same standards as any other allegation of error in the jury charge. *See Render v. State*, 316 S.W.3d 846, 851–52 (Tex. App.—Dallas 2010, pet. ref'd) ("While the *Jennings* court noted that *Williams* is 'still Texas law,' we must nevertheless apply the standard set forth in *Almanza* [*v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1985) (op. on reh'g)] to determine whether the harm is so egregious to warrant reversal."). Having concluded that there was no error in the charge, we decide appellant's fourth issue against him. *See Cortez*, 469 S.W.3d at 598.

---

[6] Article 37.10(a) provides, "If the verdict of the jury is informal, its attention shall be called to it, and with its consent the verdict may, under the direction of the court, be reduced to the proper form. If the jury refuses to have the verdict altered, it shall again retire to its room to deliberate, unless it manifestly appear that the verdict is intended as an acquittal; and in that case, the judgment shall be rendered accordingly, discharging the defendant."

**5. Range of sentence in punishment verdict form**

In his fifth issue, appellant argues the trial court erred in the punishment verdict form because without a deadly weapon finding, the range of punishment was 2 to 20 years, not the 5 to 99 years stated in the charge. He contends his sentence of 30 years is outside the second degree punishment range. For the reasons we have discussed, we conclude that the trial court did not err in submitting the first degree felony punishment range of 5 to 99 years. *See* TEX. PENAL CODE ANN. § 12.32 (first degree felony punishment). We decide appellant's fifth issue against him.

CONCLUSION

We affirm the trial court's judgment.

/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

170814F.U05

–20–



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

MIGUEL E. GARCIA-ARRENDONDO, Appellant

No. 05-17-00814-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 297th District Court, Tarrant County, Texas
Trial Court Cause No. 1468097R.
Opinion delivered by Justice Lang-Miers; Justices Bridges and Francis, participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 13th day of December, 2018.